## THE RALEIGH & GASTON RAILROAD COMPANY *v.* JOHN A. REID.

The charter of a Railroad Company, granted in 1852, provided, that " the said Railroad and all engines, cars and machinery and all the works of said Company, together with all profits which shall accrue from the same, and all the property thereof of every description, shall be exempt from any public charge or tax whatsoever for the term of fifteen years ; *and thereafter the legislature may impose a tax not exceeding twenty-five cents per annum on each share of the capital stock held by individuals*, whenever the annual profits shall exceed eight per cent ;" The annual profits had never exceeded eight per cent : *Held*, that the Legislature, in 1869, might, notwithstanding, levy, and authorize to be levied, an *ad valorem* tax not exceeding *two-thirds of one per cent*, upon *the franchise, rolling stock* and *real estate* of such Company.

*Arguendo* : All contracts between the sovereign and its citizens, as in *bank* and *railroad* charters, are made, subject to any change of circumstances that future events may develope, and to the permanent right and duty of the State to regulate the currency, and to preserve its own existence by equal taxation ;

Regulations of taxation in such charters, are rather *rough estimates* of what will be required, *things remaining as they are*, than contracts holding *in all events ;* say, even after the disasters which the common fund liable to taxation, suffers by a great war.

The theory that such regulations are *contracts* in the ordinary sense, has issued in *refinements*, devised in order to escape its results ; such as the sub-division of corporations, for taxing purposes, into *franchise, stock, dividends*, &c.,—an exhaustion of the chartered restraints upon the power of taxation in one or more of which, is held not to affect that power over others.

(*Baum* v. *Stevens*, 2 Ire. 411 ; *Foggart* v. *Blackweller*, 4 Id. 238 ; *Mills* v. *Williams*, 11 Ire. 558 ; *McRee* v. *W. & R. R. R. Co.*, 2 Jon. 186 ; *State* v. *Petway*, 2 Jon. Eq. 396 ; *State* v. *Matthews*, 3 Jon. 451 ; *Attorney-General* v. *The Bank of Charlotte*, 4 Jon. Eq. 287, cited and approved.)

MOTION to vacate an injunction, before *Watts, J.*, January 11th 1870, at Chambers, HALIFAX Court.

The complaint in the action alleged that the defendant, as Sheriff for Halifax, had distrained and was about to sell an engine belonging to the plaintiff, upon the grounds that by the lists in his hands for said county and for the State, it appeared that the plaintiff owed to him as tax for 1869, $2,368 96 ; a portion of it being levied upon the apportioned share for such county of the entire *franchise and rolling stock* of the company jointly; and the residue upon certain *lots of land* in said county belonging to the plaintiff, and necessary for the successful operation of its business. It was admitted that an Act had been passed in March 1869, which purported to authorize such a tax, and that the Sheriff had proceeded regularly thereunder. But the plaintiff claimed that it was not competent for the Legislature to levy any such tax, because of a provision in its charter, (Act of 1852, c. 140 s. 8,) according to which : " the said railroad and all engines, cars and machinery, and all the works of said company, together with all profits which shall accrue from the same, and all the property thereof of every description, shall  *  *  be exempt from any public charge or tax whatsoever, for the term of fifteen years, and thereafter the Legislature may impose a tax not exceeding twenty-five cents per annum, on each share of the capital stock held by individuals, whenever the annual profits shall exceed eight per cent.

The prayer was for, amongst other things, an order enjoining the sale of the engine, &c.

This order was accordingly made, and afterwards a motion (as above) to vacate such order, was made by the defendant, and refused.

The defendant appealed.

*Attorney General, Bragg and Battle & Sons,* for the appellant.

1. If upon a fair reading of a charter, doubts arise, they are to be decided in favor of the State: Binghamton Bridge case, 3 Wallace, 51.

2. The power of taxation cannot be restrained except by plain expressions to that effect. *Bank of Pa.* v. *Commonwealth,* 19 Pa. 144; *State* v. *Newark,* 2 Dutch. 519; *Mayor of Truro* v. *Reynolds,* 1 Moore & S. 272; *Lord Middleton* v. *Lambert,* 1 Ad. & E. 401; Cooley Const. Lim. 280, and seq.

3. The *franchise* is a thing entirely distinct from the *property,* and has so been recognized both by our courts and our Legislature: *State* v. *Rives,* 5 Ire. 297; See Rev. Code, ch. 29 §§ 9, 10, 11, and ch. 26 §§ 5 to 10; Act of 1630–'31, c. 24, particularly s. 5; *State* v. *Petway,* 2 Jon. Eq. 396; *Attorney General* v. *Bank of Charlotte,* 4 Id. 287.

*Here,* the exemption is of the *stock,* not the *franchise.*

*Moore and Rogers & Batchelor, contra.*

1. That companies are regarded as purchasers of their franchises; that the object of rules of construction when applied to contracts, is to arrive at the intention of the parties thereto, and that charters are to be construed most strongly against the corporations: are principles well established.

2. The intention of the parties *here* was to confer a total exemption from taxation for fifteen years, and an exemption subject to certain qualifications, thereafter. A tax upon the *property* is necessarily a tax upon the *stock,* which is only a representative of the property. The provision here virtually forbids taxation upon the Company in any respect at present, as there have been no annual profits of 8 per cent.

PEARSON, C. J. The distinction between corporations

that are mere agencies of the State, and corporations based on contract, is fully established, *Mills* v. *Williams* 11 Ire. 558.

It is equally well settled that contracts made by the State with individuals, in granting charters, are not to be construed by the same rules as contracts between individuals. In the latter, the rule of the common law, which is the same as common sense, is, "words are to be taken in the strongest sense against the party using them;" on the idea that self-interest induces a man to select words most favorable for himself. It is otherwise when the State is a party; for it is known that in obtaining charters, although the sovereign is presumed to use the words, in point of fact the bills are drafted by individuals seeking to procure the grant, and that "the promoters," as they are styled in England, or the "lobby members," as they are styled on this side of the Atlantic, have the charters or acts of incorporation drafted to suit their own purposes; and a matter of this kind, instead of being, in its strict sense, a *contract*, is more like the act of an indulgent head of a family dispensing favors to its different members, and yielding to importunity. So the Courts, to save the old gentleman from being stripped of the very means of existence, by sharp practice have been forced to reverse the rule of construction, and to adopt the meaning most favorable to the *grantor*. In contracts between individuals it is often difficult to say, what was intended to be *a part of the contract*, *Baum* v. *Stevens*, 2 Ire. 411, *Foggart* v. *Blackweller* 4 Id. 238; or was only an affirmation, "chaffering" (a Anglo Saxon word meaning a *chat* about the matter,) but not *in the bargain*. A horse is offered for sale; the man says, "this is as sound an animal as ever worked in harness;" Do you warrant him to be sound? There is a magic in that word *warrant*; so he says, "The horse is sound as far as I know or have reason to believe, but if you take him at my price, it is no part of the bargain that I am to stand good, if it turns out that he is not sound; pay me a consideration for the *warranty*, and that will make a difference."

Such is the law between individuals. Reverse the rule, and see how it ought to be when the State is granting charters. It is known that the State is obliged to have the means of support, and that no one set of members of the General Assembly, have power to impoverish the State for all time to come, or to throw the burthen of taxation more heavily upon one class of citizens, than on another. So the terms of the charter must be construed in reference to this known state of facts, and the State must be considered as saying : "As things now seem, a certain amount from your corporation is enough to meet the estimates."

Suppose, however, a disastrous war, or that the State loses by being security, or by the fraud of agents : Is the State to perish, and be without the means of support; or may it not be heard to say : " This talk about the sum you have to pay annually, was no part of the bargain. For the general good as was supposed,—the franchise of being a corporation, and the right to take the land necessary for your purposes, was granted, in consideration of the labor and outlay of money on your part necessary to construct the work ; what was said about the sum you were to pay annually, for the support of the government, was simply an incident to the contract, based on rough estimates, and was *no part of the contract* ; no consideration was paid for it, and it is ungrateful on your part to make a question about it, under this unforeseen change in the consideration of things."

These suggestions are made as fit matter for reflection and as tending in a great degree, to justify the *refinements* made in many of the cases, of dividing corporations into several parts for the purposes of taxation : 1. The franchise privilege of association for a common purpose, 2. The stock of the corporation, 3. The shares of the members, 4. The dividends or profits ; and, in this way, supporting a power to impose a tax on one of the parts, notwithstanding the power of taxation was seemingly exhausted, by having been made on one of the other parts, so as by implication to

exempt the whole, except for the rule, that in the construction of charters the words are to be taken most strongly against the *grantees*.

These refinements are evidently resorted to in order to avoid an expression of the plain fact: A State cannot by contract or in any other mode, surrender the power of taxation necessary for its existence. A question like this was presented in *State* v. *Matthews*, 3 Jon. 451. By the words of charter, the Bank of Fayetteville was authorized to issue bills of a denomination less than $3. This charter was granted in 1848. In 1854, "for the purpose of regulating the currency," an Act passed prohibiting the circulation of small notes, viz: under $3. The court say "these positions have been stated, to clear the way, and present the naked question. Is authority to issue small notes, conferred by the charter as a *part* of *the essence of the contract*, with the intent to put it beyond the control of all future legislation: or is it conferred as a mere incident, with the intention that it should be subject to such limitation as the Legislature might at any time thereafter, deem expedient to make for the purpose of regulating the currency of the State? This is a mere question of construction; and a plain statement seems sufficient to dispose of it. With the exception of the powers surrendered to the United States, each State is absolutely sovereign, and, with the exception of the restraints imposed by the constitution of the States and the Bill of Rights, all legislative powers are vested in the General Assembly. It is consequently unreasonable to suppose that the General Assembly, admitting that it has the power, would alien or surrender and make subject to any individual or corporation, a portion of its sovereignty; and thereby disqualify itself from doing that for which these ample powers are conferred on it.

As is said in *McRee* v. *W. & R. R. R. Co.*, 2 Jon. 186, we should hesitate long before bringing our minds to the conclusion that it was the intention of the Legislature to take from itself the power of doing that for which all gov-

ernments are organized; "promoting the general welfare, &c."

·This case and the authorities by which it is supported, fully sustain the conclusion to which we have arrived, upon a broad and liberal view of the powers of government; that all contracts between the sovereign and its citizens in Bank and Railroad charters, are presumed to be made, subject to the change of circumstances that future events may develope, and to the right and duty of the State to regulate the currency and to preserve its own existence by equal taxation.

Taking a more narrow view of the subject, and descending to the *refinement* by which corporations are treated in the courts as divisible into four parts : The charter provides that the railroads and all engines, &c., and all profits, and all the property of the company, shall be exempt from any public charge or tax whatsoever for the term of fifteen years, "and thereafter the Legislature may impose a tax not exceeding twenty-five cents per annum on *each share of the* capital stock held by individuals, whenever the annual profits shall exceed eight per cent."

The question is, does the express right, after fifteen years, to impose a tax of twenty-five cents, on each share of the capital stock, exclude, by *implication*, the right to tax the franchise or the land on which the road is constructed, and the depots, &c., are built, with the rolling stock, &c.

No one can entertain a doubt on the subject, after reading the authorities, unless he loses sight of the fact that in railroad and bank charters and the like, the words are to be taken most strongly against the corporation, and that no intendment or implication is to be made by which a sovereign can divest itself of the right of taxation and the duty to regulate the currency, and so to govern, as to provide for and protect the general welfare.

*State* v. *Petway*, 2 Jon. Eq. 366, which was ably argued and well considered by the court, fixes the principle: A tax

in the charter, of twenty-five cents on each share of the capital stock, does not exhaust the power of taxation; and the General Assembly may impose an additional tax on the dividends, &c., &c.

Here is a corporation owning land that, to suit its convenience, is located to reach from Raleigh to Weldon; on this land is constructed a road bed; the company likewise owns parcels of land at suitable distances, on which depots, warehouses, &c., are erected; it also owns rolling stock, &c., of great value: Why should not the franchise and all of this property be liable to an *ad valorem* tax?

The plaintiff answers:—"It was exempted from taxation for fifteen years, and individuals are supposed to have bought stock on the idea that no tax would be imposed, except the twenty-five cents on the share whenever the profits exceed eight per cent."

But, until recently, horses and farming utensils have never been taxed, and it may as well be said that this kind of property was bought on the idea that it would never be made the subject of an *ad. valorem* tax.

For a second reason the plaintiff says:—"After the expiration of fifteen years, it is in the power of the Legislature to impose a tax *not exceeding* twenty-five cents on each share: but here is an attempt to exceed that amount, and to disregard the qualification that even twenty-five cents on the share can be exacted only when the profits exceed eight per cent."

It may be, that, according to the ruling in *Attorney General* v. *Bank of Charlotte,* 4 Jon. Eq. 386, the tax *on the shares* could not have been increased, from twenty-five cents, say, to fifty cents; but this case recognizes the power to tax any other subject on which the tax is not imposed by the charter. As in our case, the tax spoken of in the charter is that upon the shares of stock, *how can that* exhaust the power of taxation in regard to the franchise, or on the land, and personal property of the corporation?

It does not, unless like King Lear, the State has divested itself of all of the attributes of sovereignty and divided "the kingdom" among ungrateful children.

Order in the court below reversed. This will be certified.

