COMMISSIONERS OF WILKES COUNTY v. CLARENCE CALL,
Sheriff and *ex officio* Treasurer of Wilkes County, et als.

(Decided November 9, 1898).

*County Bonds—Railroad Stock—Invalidity—Estoppel.*

1. Legislation authorizing the creation of county indebtedness must conform to constitutional requirements.

2. A county bond stating on its face the Act under which it is issued is notice to the holder, and estops him from controverting the statement.

CIVIL ACTION pending in WILKES Superior Court and heard, by consent, before *Starbuck, J.,* at Winston, upon a motion by defendants to vacate the restraining order, heretofore granted, until the final hearing.

The prayer of the complaint was to enjoin the defendant, County Treasurer of Wilkes, from paying the coupons on county bonds issued in aid of the Northwestern North Carolina Railroad Company on the ground that the bonds in controversy were issued by the Board of Commissioners of Wilkes county, without lawful authority so to do, and are invalid and void.

His Honor refused the motion to vacate the restraining order, and defendants excepted and appealed.

The statement of the case fully appears in the opinion of the Court, and in the dissenting opinions.

COMMISSIONERS *v.* CALL.

*Mr. A. C. Avery*, for plaintiffs. .

No counsel *contra.*

DOUGLAS, J.: This is an action brought to test the validity of certain bonds issued by Wilkes county in payment of its subscription to the stock of the North-western North Carolina Railroad Company. The suit was brought by the Commissioners of the County of Wilkes against the County Treasurer. The defendants Turner and Wellborn, who had become the owners of one of the bonds after the bringing of this action, by leave of the court, became parties defendant, and invited all other bond-holders to come in and join them in resisting the action.

In the face of each bond, dated October 1, 1889, appears the explicit statement that: "This bond is one of a series of one hundred bonds of the denomination of one thousand dollars each, issued by authority of an Act of the General Assembly of North Carolina, ratified the 20th day of February, A. D. 1879, entitled: 'An Act to amend the charter of the Northwestern North Carolina Railroad for the construction of a second division from the towns of Winston and Salem, in Forsyth county, up the Yadkin Valley, by Wilkesboro, to Patterson's Factory, Caldwell county'", etc. The bond does not allude in any way to any other legislative act, nor does it profess to claim further validity than that derived from the recited act.

It is admitted, as well as clearly shown by the evidence, that this Act of February 20, 1879, was not passed in accordance with the mandatory provisions of the Constitution of this State, as construed by this Court inasmuch as upon the passage of said bill upon its second reading in the House of Representatives,

there was no call of the ayes and noes, and further that the vote upon such reading was not recorded in the Journal of the House.    Constitution, Article II, Section 14.    The amendatory Act of 1881 is subject to the same objection.    In view of the recent decisions of this Court it is useless to discuss this question now, as the rule has been definitely settled in the following cases: *Bank* v. *Commissioners of Oxford*, 119 N. C., 214; *Commissioners* v. *Snuggs*, 121 N. C., 394; *Charlotte* v. *Shepard*, 120 N. C., 411 and 122 N. C., 602; *Rodman* v. *Town of Washington*, 122 N. C., 39.    Under the authority of these decisions we are compelled to hold that the entire issue of these bonds is null and void for want of legislative authority.    An Act of the Legislature passed in violation of the Constitution of the State, or in disregard to its mandatory provisions, is to the extent of such repugnance, absolutely void; and all bonds issued thereunder bear the brand of illegality stamped upon their face by the hand of the law.

The Act under which these bonds profess to have been issued was never legally passed and never became a law.    As was said in *Norton* v. *Shelby County*, 118 U. S., 425, "An unconstitutional Act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

The Constitution of the State is plenary notice to the world of its organic law.    There can be no *bona fide* holders of unconstitutional obligations, nor can ignorance of public statutes and legislative Journals be deemed otherwise than wilful or negligent.    The Journals are published for the information of the public, and are widely distributed and easily accessible, fully as

much so as the public records of a county. Surely no one would be heard to say that he was the *bona fide* owner of a piece of land simply because he held a deed therefor, when an inspection of the records would show that his grantor had no power to convey. It has been well said in *U. S.* v. *Macon County Court*, 99 U. S., 582, "The difficulty lies in the want of original power. While there has undoubtedly been great recklessness on the part of the municipal authorities in the creation of bonded indebtedness, there has not unfrequently been *gross carelessness* on the part of purchasers when investing in such securities. Every purchaser of a municipal bond is chargeable with notice of the statute under which the bond was issued If the statute gives no power to make the bond, the municipality is not bound."

A careful distinction should be drawn between the want of power to issue bonds, and mere irregularities in the exercise of that power. The latter, under certain circumstances, may be cured by recitals, or eliminated by estoppel; but a want of power goes to the very root of the transaction, and destroys its vitality. A tree may yet live though its branches are badly shattered by the storm, but the last leaf falls when the root is dead.

This rule has been clearly laid down by the Supreme Court of the United States in the oft-cited case of *Anthony* v. *County of Jasper*, 101 U. S., 693, where Chief Justice White says: "Dealers in municipal bonds are charged with notice of the laws of the State granting power to make the bonds they find on the market. This we have always held. If the power exists in the municipality, the *bona fide* holder is protected against mere irregularities in the manner of its execution, but if there is a want of pow-

er, no legal liability can be created. When the bonds now in question were put out the law required that to be valid they must be certified to by the Auditor of State. In other words, that officer was to certify them before their execution was complete, so as to bind the public for their payment. We had occasion to consider in *McGarrahan* v. *Mining Co.*, 96 U. S., 316, the effect of statutory requirements as to the form of the execution of patents to pass the title of lands out of the United States, and there say: 'Each and every one of the integral parts of the execution is essential to the validity of a patent. They are of equal importance under the law, and one cannot be dispensed with more than another. *Neither is directory, but all are mandatory.* The question is not what, in the absence of statutory regulations, would constitute a valid grant, but what the statute requires.' The same rule applies here. The object to be accomplished is the complete execution of a valid instrument, such as the law authorizes public officers to put out and bind for the payment of money the public organization they represent."

By repeated adjudications this has become the settled rule of that court. *Police Jury* v. *Britton*, 82 U. S., 566, 570, 572; *Claiborne County* v. *Brooks*, 111 U. S., 400, 406; *Bank* v. *Porter Township*, 110 U. S., 608, 618; *Concord* v. *Robinson*, 121 U. S., 165, 167; *Kelley* v. *Milan*, 127 U. S., 139, 150; *Norton* v. *Dyersbury*, 127 U. S., 160, 175; *Young* v. *Clarendon Township*, 132 U. S., 340; *Hill* v. *Memphis*, 134 U. S., 198, 203; *Merrill* v. *Monticello*, 138 U. S , 673, 686, 687; *City of Brenham* v. *Bank*, 144 U. S., 173; *Savings Asso.* v. *Perry County*, 156 U. S., 692, 704.

But it is urged that while the bonds were expressly issued under the Act of 1879, there was, apparently un-

known to both parties to the transaction, and certainly ignored by them, an existing authority to issue said bonds derived from an ordinance of the Constitutional Convention passed in 1868; and that therefore, we should hold that these bonds were unwittingly issued under that ordinance, and are therefore valid. The only authority we can find in that ordinance in any way authorizing the subscription to the stock of the company or the issuing of the bonds, is as follows: "Section 2. That the capital stock of said company may be created by subscriptions on the part of individuals, corporations and counties, in shares of one hundred dollars." "Section 12. Be it further ordained that the stockholders of said company may pay the stock subscribed by them either in money, labor or material for constructing said road, as the board of directors may determine, and that all counties or towns subscribing stock to said company shall do so in the *same manner and under the same rules, regulations and restrictions* as are set forth and prescribed in the Act incorporating the North Carolina and Atlantic Railroad Company, for the government of such towns and counties as are now allowed to subscribe to the capital stock of said company." That said ordinance cannot be relied on to support the validity of the bonds at issue is apparent for several reasons: First. We do not see that any authority whatever is given or attempted to be given by either of these sections, to Wilkes county to subscribe to the capital stock of this company. But it is said that section 12, by referring to the charter of the "North Carolina and Atlantic Railroad Company", by which we presume is meant The Atlantic & North Carolina Railroad, chapter 136 of the Laws of 1852, confers upon the different counties, through or near which

the Northwestern North Carolina Railroad may run, the same authority to subscribe as was given to the counties tributary to the former company. Said section does not refer generally to the Act of 1852, nor does it profess to confer any of the powers therein granted. It simply says that those counties and towns that do subscribe "shall do so in the *same manner and under the same rules, regulations and restrictions*" as are prescribed in the former Act. The words, "same restrictions," are peculiarly significant here, as the Act of 1852, section 45, provides in express terms that "if the said road be not *completed* within six years after the ratification of this Act, *this charter shall be forfeited.* Therefore, even if the powers granted in the Act of 1852 had been given to the Northwestern North Carolina Railroad Company or the counties in its interest, subject to the "same restrictions," those powers would have expired by their own limitation long before their attempted exercise 23 years thereafter. As all such powers must be strictly construed, this restrictive provision must be held to be in the nature of a limitation and not a condition subsequent. That is, the authority given to the counties to subscribe, if it ever existed, expired at the end of six years unless already exercised in such a way as to create vested rights. But it makes no difference how the power was exercised, if there was no power. Section 12 of the ordinance of 1868 does not refer to section 33 of the Act of 1852, which confers the power, but is evidently limited by its very terms to sections 34, 35 and 36, which prescribe the *manner* in which that power must be exercised by the counties or towns to which it may have been granted. It would have been very easy for the convention to have given the same authority granted in section 33, either in ex-

press terms or by reference to said section, but it has not done so and we cannot do so by judicial construction. There is no principle better settled than that all charters granting special privileges or powers must be not only strictly construed, but must be construed most strongly against the grantee. This rule with the reasons therefor has been so clearly stated by Chief Justice Pearson in *Railroad* v. *Reid*, 64 N. C., 155, 158, that we can do no better than to quote his language, as follows: "It is equally well settled that contracts made by the State with individuals, in granting charters, are not to be construed by the same rule as contracts between individuals. In the latter case, the rules of common law, which is the same as common sense, is, ' words are to be taken in the strongest sense against the party using them,' on the idea that the said interest induces a man to select words most favorable for himself. It is otherwise where the State is a party; for it is known that in obtaining charters, although the sovereign is presumed to use the words, in point of fact the bills are drafted by individuals seeking to procure the grant, and that 'the promoters,' as they are styled in England, or the 'lobby-members,' as they are styled on this side of the Atlantic, have the charters or acts of incorporation drafted to suit their own purposes; and a matter of this kind, instead of being in its strict sense a *contract*, is more like the act of an indulgent head of the family dispensing favors to its different members and yielding to importunity. So the courts, to save the old gentleman from being stripped of the very means of existence by sharp practice, have been forced to reverse the rule of construction, and to adopt the meaning most favorable to the grantor." The same rule is laid down in *Railroad Co.* v. *Canal Commissioners*, 21 Pa. St.

Rep., 9, 22, where Chief Justice Jeremiah S. Black, says for the court: "It may be that the privilege which the relators claim might arise by implication out of their charter or some other Acts cited by their counsel, if we were at liberty to give them the broad construction which we sometimes apply to other laws of a different character. But corporate powers can never be *created by implication nor extended by construction.* No privilege is granted unless it be expressed in plain and unequivocal words, testifying the intention of the legislature in a manner too plain to be misunderstood. When the State means to clothe a corporate body with a portion of her own sovereignty, and to disarm herself to that extent of the powers which belong to her, it is so easy to say so that we will never believe it to be meant when it is not said; and words of equivocal import are so easily inserted by mistake or fraud that every consideration of justice and policy requires that they should be treated as nugatory, when they do find their way into the enactments of the Legislature. In the construction of a charter, to be in doubt is to be resolved; and every resolution which springs from doubt is against the corporation. This is the rule sustained by all the courts in this country and in England. No other has ever received the sanction of any authority to which we owe much deference. This Court has asserted it times without number. We have ruled five or six important cases upon it within the last year. We seem not to have made much impression on the professional mind, and we are probably making as little now. But when respectable counsel call upon us hereafter (as they doubtless will) to enlarge corporate powers by construction, we can only repeat again and again that our duty imperatively forbids it. The privileges of the Pennsyl-

vania Railroad Company may be too rigidly restricted. If the usefulness of the company would be increased by extending them, let the Legislature see to it.    But let it be remembered that *nothing but plain English words will do it.*"

It should be borne in mind that there is no pretence of authority for the issue of these bonds outside of the charter of the North-Western North Carolina Railroad Company and its amendments.    It has been the actor as well as the beneficiary throughout, and therefore the Acts under consideration come peculiarly within the rule of strict construction laid down by the two great Chief Justices from whom we have quoted.

We have not overlooked the fact that in *Belo* v. *Commissioners*, 76 N. C., 489, this Court strongly intimates that section 12 of the charter did confer the authority given in section 33 of the Act of 1852; but it does so incidentally and with little discussion, because it was not denied in the pleadings.    This was not the determining point in the case, which turned chiefly upon the recitals in the bonds and the ratifying Act of 1868. This is clearly shown in the opinion itself, which devotes four pages to the discussion of equitable estoppel arising on the recitals; and about half a page to the possible binding effect of the ordinance, winding up with the significant sentence on page 497 that "as the case is presented to us, that question does not arise and we do *not* decide it."    It evidently did not receive careful investigation, as it apparently did not arise on the pleadings.    The Court stated that "the principle of equitable estoppel is a most important element in the transaction" and that the recitals in the bonds (which were essentially different from those now before us) constituted an estoppel in *pais* upon the County of Forsyth.    Can it be

questioned that estoppels must be mutual, and that he who relies upon the recitals in the bond to estop another must himself be bound by them? If this is so, it ends the case at bar, as all the recitals 'point to the unconstitutional Act of 1879. The case of *Hill* v. *Commissioners*, 67 N. C., 367, considering simply the power of the legislature to authorize the issue of bonds, has no bearing upon the present case. The Forsyth County bonds recited that *they* were "authorized by an ordinance of 1868, by an order of the Court of Pleas and Quarter Sessions of Forsyth County at June Term, 1868, and re-enacted and ratified and confirmed by an Act of the General Assembly ratified the 11th of August, 1868." The cases are clearly distinguishable. Another important point of difference is that the Forsyth County bonds were voted and subscribed within a few months after the passage of the ordinance, before whatever power it may have given, if any, had expired by its own limitation. It is evident that the legislature as well as the railroad company itself thought that the authority given in the ordinance was not sufficient, as in both cases additional legislation was sought and obtained. But with this essential difference. In the case at bar, the amendatory act having been passed in violation of mandatory provisions of the Constitution, in legal contemplation, was never passed. As it has no legal existence, we have no authority to construe it, but simply to obliterate it. In *Jarratt* v. *Moberly*, 103 U. S., 580, 588, the Court in discussing a similar case says: "Further legislation was needed. Such was the evident opinion of the Legislature of the State, for by an additional Act, passed on the 29th March, 1872, the authority was given in terms." And on page 685 it says: "A constitutional provision should not be construed so

as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief at which it was aimed."

Secondly: The bonds on their face profess to have been issued under an entirely differently statute.

The principle laid down by the Federal authorities, and practically of universal acceptance, is that estoppels rest upon the recitals in the bond. The rule is generally cited as laid down in *Town of Colonia* v. *Eaves*, 92 U. S., 484, as follows: "When legislative authority has been given to a municipality, or to its officers, to subscribe to the stock of a railroad company, and to issue municipal bonds, in payment, but only on some precedent condition, such as a popular vote favoring the subscription, and where it may be gathered from the legislative enactment that the officers of the municipality were invested with power to decide whether the condition precedent has been complied with, their recital that it has been, *made in the bonds* issued by them and held by a *bona fide* purchaser, is conclusive of the fact and binding upon the municipality; *for the recital is itself a decision of the fact by the appointed tribunal.*" *Buchanan* v. *Litchfield*, 102 U. S., 278; *Bank* v. *Porter*, 110 U. S., 608, 616.

In the case at bar the bonds recite that they were issued under the Act of 1879; and as all estoppels of this nature to be operative must be mutual, are not the bondholders themselves estopped from setting up any facts to the contrary? These recitals point out the very Act under which the power is claimed, and it was the duty of all persons claiming thereunder to see that the Act met the constitutional requirements.

Certainly the estoppel can never go further than the recital itself. It cannot operate upon any other Act,

nor as to the validity of any Act.   In *Gilson* v. *Dayton*, 123 U. S., 59, it was held that "As it appears on the face of the bonds sued on in this action that they were issued under the special Act of February 18, 1857, which was held void in *Post* v. *Supervisors*, 105 U. S., 667, and not under the general law of March 6, 1867, the judgment dismissing the action is affirmed."   As was said in *County of Davies* v. *Huidekoper*, 98 U. S., 98, 100, "There must indeed be power, which if formally and duly exercised, will bind the county or town.   No *bona fides* can dispense with this, and no recital can excuse it."   In *Dixon County* v. *Field*, 111 U. S., 83, 92, it was held that the estoppel arising from recitals, in the face of the bonds, never extended to or covered matters of law, and could arise only "upon matters of fact which the corporate officers had authority to determine and to certify."

Thirdly: That ordinance did not create a contract between the railroad company and the county of Wilkes. The only contract that has ever existed between them was the contract of 1888, which was subject to all the constitutional provisions then existing.   The mere authority given in the charter of a railroad company to receive subscriptions from municipal corporations, where no consideration is given and no attempted exercise of the power, has none of the essential elements of a contract, and is held at the pleasure of the law making power.   Much more so is it subject to constitutional restrictions.   *Town of Concord* v. *Bank*, 92 U. S., 625, 630; *Concord* v. *Robinson*, 121 U. S., 165, 169; *Loan Asso.* v. *Perry County*, 156 U. S., 692, 697.   *Concord* v. *Bank*, *supra*, was overruled in *Fairfield* v. *Gallatin*, 100 U. S., 47, only in so far as it applied to the Constitution of Illinois, and for the only reason that the

Supreme Court of the United States deemed it proper, in the construction of a State Constitution, to follow the State decisions instead of their own view of the law. The general principle remains unchanged, and meets our approval.

The ratification of the Constitution on the 24th day of April, 1868, when it went into effect for all domestic purposes, annulled all special powers remaining unexecuted and not granted in strict accordance with its requirements. Article II, Section 14, is as follows: "No law shall be passed to raise money on the credit of the State or to pledge the faith of the State, directly or indirectly, for the payment of any debt, or to impose any tax upon the people of the State, or to allow the counties, cities or towns to do so, unless the bill for the purpose shall have been read three several times in each House of the General Assembly, and passed three several readings, which readings shall have been on three different days, and agreed to by each House respectively, and unless the yeas and nays on the second and third reading of the bill shall have been entered on the Journal." Article VII, Section 7, is as follows: "No county, city, town or municipal corporation shall contract any debt, pledge its faith, or loan its credit, nor shall any tax be levied, or collected by any officers of the same, except for the necessary expenses thereof, unless by a vote of a majority of the qualified voters therein."

The intention of the Constitution is obvious. Profiting by the sad experience of other States, it intended to restrict the granting of public aid, and to hold to the strictest accountability every member of the legislature who assisted in such grant by forcing him to twice record his vote on the Journal, where it would be open

to public inspection. It further intended that every
such grant should be the deliberate and intelligent Act
of the Legislature itself as well as of the community
affected thereby. It is our duty to give to these salutary
provisions that just construction, required alike by the
rules of law and of common sense, that will effectuate
and not destroy their beneficial purpose. This view we
think is sustained by the uniform decisions of the
Supreme Court of the United States, the only tribunal
before which this decision can ever lawfully come for
review. In *Wadsworth* v. *Supervisors*, 102 U. S., 534,
537 (citing and reaffirming *Aspinwall* v. *Commissioners
of Davies County*, 22 How. 364) the Court says: ''We
held in that case that the popular vote did not itself
create a vested right in the railroad company to the
bonds, and that a subscription was necessary to create a
contract binding the county to issue bonds in payment
of the stock, and binding the company to receive stock
for the bonds. 'Until the subscription is made,' said
Mr. Justice Nelson, speaking for the whole court, 'the
contract is unexecuted and obligatory on neither party.'
Hence the new State Constitution was held to govern
the case, and from the time of its adoption to have
withdrawn from the county commissioners all authority
to make subscriptions to the stock of incorporated com-
panies, except in the manner and under the circum-
stances prescribed in that instrument." In *Norton* v.
*Brownsville*, 129 U. S., 479, 490, Chief Justice Fuller,
speaking for the entire Court, says: ''These cases (re-
ferring to *Concord* v. *Savings Bank*, 92 U. S., 625,
*Falconer* v. *Railroad*, 69 N. Y., 491; *Railroad* v. *Fal-
coner*, 103 U. S., 821; *Wadsworth* v. *Supervisors*, 102
U. S., 534, and *Aspinwall* v. *Commissioners*, 22 Howard,
364) sufficiently illustrate the distinction between the

operation of a constitutional limitation upon the power of the Legislature and a constitutional inhibition upon the municipality itself. In the former case, past legislative action is not necessarily effective, while in the latter it is annulled. Of course if an entirely new organic law is adopted, provision in the schedule or some other part of the instrument must be made for keeping in force all laws not inconsistent therewith, and this was furnished in this instance by the first Section of Article II, but such a provision does not perpetuate any previous law, enabling a municipality to do that which it is subsequently forbidden to do by the Constitution. The inhibition being *self-executing* and operating directly on the municipality, and not in itself enabling the latter to proceed in acordance with the rule prescribed, *further legislation is necessary before the municipality can act.*" In the late case of *Railway* v. *Texas*, 170 U. S , 226, it is held that "a clause in a charter of a railroad company granting it power to consolidate with or become the owner of other railroads, is *not* such a vested right that cannot be rendered inoperative by subsequent legislation passed before the company avails itself of the power thus granted." It is useless to cite the cases themselves cited in the cases referred to herein. .

It is further urged on the part of the defendants and those whom they represent, that the issuing of these bonds was authorized by Sections 1996 to 2000 of *The Code*. This question was definitely settled in *Commissioners* v. *Snuggs*, 121 N. C., 394, 400, 401, and we see no reason to reverse our ruling, nor do we find any facts taking this case from its operation. We can add nothing on this point to what was therein so fully and ably said in the opinion of the Court, except to say that

if the construction contended for by the defendants must be placed upon those sections, then they are in direct violation of the letter and spirit of the Constitution, inasmuch as they practically annul one of its essential provisions. If the word "uncompleted" can refer to any road not yet begun, and the word "interest" apply to a mere friendly feeling or supposed advantage to be derived from the general building up of the country, then the several counties may go on forever subscribing unlimited amounts to any railroad *in esse* or *in futuro* that may be located within the range of their knowledge. Such a construction would simply nullify the Constitution by making its explicit restrictions vain and worthless. It cannot be adopted by us, but, if we were forced to adopt it, we would be equally forced to declare those sections null and void. If they mean that, they have no place upon the statute books. While the Legislature may, in individual cases, grant to specific counties the necessary authority in accordance with the provisions of the Constitution and subject to its restrictions, it cannot, by a sweeping Act of unlimited application, utterly destroy its operation. If the Legislature or the railroad company or the county had placed any such construction on those Sections, additional legislation would have been deemed useless, and the recitals in the bonds would have been different. It is true that this road had been begun and was in one sense uncompleted when the subscription was made, but it was *not* begun when the Constitution was ratified, and the county at that time had no pecuniary interest in it, nor any interest contemplated by the Statute.

It is not necessary for us to consider the fact that the first section of the road had been completed to Winston,

beyond which all idea of extension seems for years to have been abandoned. The Act of 1881 has no reference to the bonds in question and is subject to the same objections as the Act of 1879, which we have been discussing.

We have given this case the most thorough investigation and careful consideration on account of the important principles and the large amount involved. We deeply deplore the fact that many parties must suffer, who are in morals, if not in law, innocent holders of the bonds, but their loss comes from their misplaced confidence in those from whom they received the bonds, and the negligence of the corporation to which the power was professedly given and the bonds were issued. The only authority for their issue is found in a railroad charter, and we cannot undertake to validate defective or unconstitutional legislation by judicial construction. The suggestion of repudiation, so strongly urged here and elsewhere, has no weight with us. The so-called repudiation of an unconstitutional obligation is a contradiction in terms, and its assertion amounts simply to a moral and legal absurdity.

It has been said that the usual difference between heterodoxy and orthodoxy is the difference between your doxy and my doxy, and that in financial ethics the same distinction exists between stealing and financiering. This distinction we cannot endorse. It is just as wrong to wring from an unwilling and perhaps a suffering debtor an unjust debt, as it is to deprive a creditor of a just debt. We will try to do neither, but will hew to the line. The strictly moral aspect of the case is not before us, but it is possible that the plaintiffs, representing an honest, industrious and intelligent people,

may have reasons for their action as strong in morals as in law.

Enough appears to indicate, what is common knowledge, that the stock for which these bonds were issued has been swept away in the maelstrom of corporate reorganization. It may be that the plaintiffs, deprived of every vestige of consideration by the decree of a court of equity, may not feel any moral obligation beyond the strict letter of the law. They may see no difference between repudiation and reorganization when both accomplish the same result, to retain the benefit and shift the burden.

In *Lewis* v. *Pina County*, 155 U. S., 54, 58, it was held that bonds issued under an Act of the Legislature of the territory of Arizona, which was in violation of the Revised Statutes of the United States, were *void*, and *"created no obligation against the County which a court of law can enforce."* In the carefully considered case of *Brenham* v. *Bank*, 144 U. S., 173, 182, 188, the court says: "It is easy for the Legislature to confer upon a municipality, when it is constitutional to do so, the power to issue negotiable bonds; and, under the *well settled rule that any doubt as to the existence of such power ought to be determined against its existence,* it ought not to be held to exist in the present case. . . . . As there was no authority to issue the bonds, even a *bona fide* holder of them cannot have a right to recover upon them or their coupons." Citing *Marsh* v. *Fulton County*, 10 Wall., 676, *East Oakland* v. *Skinner*, 94 U. S., 255; *Buchanan* v. *Litchfield*, 102 U. S., 278; *Hayes* v. *Holley Springs*, 114 U. S., 120; *Davies County* v. *Dickinson*, 117 U. S., 657; *Hopper* v. *Covington*, 118 U. S., 148, 151; *Merrill* v. *Monticello*, 138 U. S., 673, 681, 682.

COMMISSIONERS *v.* CALL.

It has been suggested that the defence in this case has been only colorable, as but one of the bonds was represented. Under the circumstances we think that was sufficient. An elaborate answer, evidently prepared by able counsel, has been filed, presenting every reasonable defence; and while no argument was made before us for the defendants, every phase of the case has been carefully examined by us in the five months during which we have held it under advisement. The plaintiffs had no means of knowing who held the bonds, as they are payable to bearer and pass from hand to hand without endorsement or registration. The bondholders themselves could have become parties at any stage of the proceedings, and would have been gladly heard by us; but the mere fact that they deliberately refrained from any participation in the defence when they had every opportunity of doing so, should not deprive the plaintiffs of all power to protect the rights of the people they represent in a court of competent jurisdiction, where alone this action could be brought by them.

The current of authority from other States sustains the conclusions we have reached in this case, but owing to the large number of cases, we have thought it best to cite only from our own decisions and those of the Supreme Court of the United States.

For the reasons stated in this opinion, the judgment of the Court below is affirmed.

Affirmed.

FURCHES, J., dissenting: On the 9th of March, 1868, the Constitutional Convention of North Carolina passed an ordinance, chartering and authorizing the formation of a corporation, to be known as the "North-Western

North Carolina Railroad Company." Under this char-
ter said company was formed and organized, and on the
25th of March, 1868, the county of Forsyth subscribed
$100,000 to said corporation, which subscription was
held to be valid in *Hill* v. *Commissioners*, 67 N. C.,
367. In payment of this subscription the County of
Forsyth issued coupon bonds to the amount of $100,000
and they were held to be valid against the county in
*Belo* v. *Commissioners*, 76 N. C., 489, and the work of
constructing said road between Greensboro in the county
of Guilford and Winston in the county of Forsyth, was
commenced. This part of the road was completed and
put into operation within the next few years and has
continued to be run and operated ever since.

This charter made Winston a point to which the road
should run, west of its starting point on the North
Carolina Railroad. From this point (Winston) it was
authorized to build branch roads, but none were built
until 1887, when the company proposed to build a
branch of its road from Winston to or near Wilkesboro
in Wilkes County, provided Wilkes County would make
a subscription of $100,000 to the capital stock of said
company.

This proposition to subscribe $100,000 to the capital
stock was submitted to the qualified voters of said
county, by the commissioners thereof, the vote taken, a
majority of the whole qualified voters of said county
voted for the subscription. The subscription was made
and the road built to Wilkesboro in compliance with
the agreement of the railroad company and the bonds
now asked to be declared invalid were issued by the
county, delivered to the railroad company and the in-
terest thereon regularly paid until the commencement
of this action. All these facts are shown by the record

COMMISSIONERS *v.* CALL.

and are admitted to be true. But there having been a change in the personnel of the board of commissioners since said bonds were issued and since said road was built, this new board is seeking in this action to repudiate the action of the former board.

I understand the Court to rest its opinion on two grounds—the want of power in the commissioners to submit the proposition to the voters and to issue the bonds; and the doctrine of estoppel. If there is error in these positions, I shall contend that the conclusion to which the Court has arrived is erroneous and should be reversed.

I admit that if the commissioners had no legislative authority to submit the proposition of subscription to the voters of Wilkes, that these bonds are void and the judgment of the court is correct. But I propose to show that they had this authority and that the bonds are valid.

The charter (the ordinance of the convention) in express terms makes the charter of the Atlantic & North Carolina Railroad Company a part of the charter of the North Western North Carolina Railroad Company, so far as it relates to the subscription of counties to the capital stock of the company. This being so the charter of the Atlantic and North Carolina Railroad Company is to be read and considered as a part of the charter of the Northwestern North Carolina Railroad Company. *Range Co.* v. *Carver*, 118 N. C., 323; *Commissioners* v. *Higginsbothern*, 17 Kansas, 62. It is like an instrument referring to another instrument, *Flaum* v. *Wallace*, 103 N. C., 296, or where the complaint in one action refers to the complaint in another action for data, *Alexander* v. *Norwood*, 118 N. C., 381, they are to be read and considered together as one instrument.

I have shown that the subscription made to this company (the North-Western North Carolina Railroad Company) by the County of Forsyth, under the charter as originally passed, has been sustained, and held to be valid by this court in *Hill* v. *Commissioners, supra.*

This decision established the power—the authority— to submit the proposition of subscription to the voters of the county and to issue bonds. But the validity of the bonds issued on this subscription of Forsyth was again put directly in issue in the case of *Belo* v. *Commissioners of Forsyth*, in a mandamus proceeding, to compel their payment and their legality was again sustained by this Court. *Belo* v. *Commissioners*, 76 N. C., 489. This case, also, as I contend, established the authority to submit the question to the voters, and to issue these bonds.

It is true that the submission of this question in Forsyth was made by the Justices of the Peace, acting as a county court. And it is true that the charter provides that the question should be submitted by them. But this charter was passed and this submission was made and bonds issued, before the adoption of the Constitution of 1868, which did not go into effect until the 22nd of April of that year. By this Constitution and subsequent legislation, the county court was abolished and the county commissioners succeeded to their powers in this matter and in all such cases. It is so held by this Court in *Belo* v. *Commissioners, supra*, and it is expressly so provided by the Legislature. Section 1997 of *The Code.*

Therefore, while the submission of the question in Wilkes was by the commissioners, they were the successors of the Justices and the county court, fully and

COMMISSIONERS *v.* CALL.

clearly authorized to make the submission and the subscription and to issue the bonds.

But it is contended by the Court that if the charter authorized this subscription and the issue of the bonds now sought to be repudiated, that it was passed before the Constitution of 1868 went into effect and that it was thereby repealed. To support this position *Aspinwall* v. *Commissioners of Davies County*, 22 Howard, 364 and *Lewis* v. *Pina County*, 155 U. S., 54, are cited by the Court. Neither of these cases, in my opinion, sustain the position for which they are cited. The first case cited (22 Howard) is intended to raise the question of violating a contract under the Constitution of the United States, and nothing more. The submission in that case was made, and the vote thereon was had in 1849, but the subscription to the capital stock was not made, and the bonds were not issued until 1852. In the meantime the Constitution of the State (Indiana) had been amended so as to prohibit any county in the State from issuing such bonds. But Davies County proceeded to issue the bonds under said submission and vote and to put them on the market, but afterwards refused to pay them; and the plaintiff, being the holder of a part of these bonds, undertook to enforce their payment. There was no question made in that case but what the Constitution had inhibited their issue. But the plaintiff claimed that the submission and the vote thereon, which were before the amended Constitution, amounted to a contract; and that the new Constitution, which prohibited the county from issuing the bonds, was an impairment of the obligation of this contract and therefore in violation of the Constitution of the United States. No such question as this arises in this case. There is no pretense that these bonds are

protected by any provision of the Constitution of the United States.

But it is denied by the defendants that the Constitution of 1868 repealed the charter of this road, or that it prohibited Wilkes county from making this subscription or issuing these bonds, as I expect to show.

The case of *Lewis* v. *Pina County* arose out of the legislation of Arizona Territory. The Legislature of this territory passed an act authorizing Pina County to issue bonds for the construction of a railroad. This being a territorial government, it had no legislative powers except those granted by Congress. And it was held in that case, that Congress had not only failed to grant such legislative power, but had in express terms prohibited its exercise, and the bonds were held to be void. I fail to see the argument to be drawn from this case against the validity of the bonds under consideration. As has been stated, the charter of the North-Western North Carolina Railroad was passed before the adoption of the Constitution of 1868, which took effect on the 22nd of April of that year. But the Legislature passed an act, ratified on the 11th of August, 1868, as follows:

"Section 1. The General Assembly of North Carolina do enact: That an ordinance entitled 'An ordinance to incorporate the North-Western North Carolina Railroad Company', ratified the 9th day of March, A. D. 1868, be and the same is hereby, re-enacted, ratified and confirmed."

If there had been a repeal of this charter by the Constitution, which I contend there had not been, it seems to have been re-enacted in August, 1868.

It has not escaped my attention that there is in the printed record an agreement as to what Acts are to be

considered by the Court in deciding this case, and the
Act of 1868 is not one of those named.    This agreement
is signed by the counsel for plaintiffs and by counsel for
Mr. Turner and Mr. Welborne, but it is not signed by
any one for the defendant Call.    But if it had been
signed by Call, I would have to disregard it.    Parties
may agree upon facts that I would feel bound by; but
I cannot feel bound by an agreement as to what is the
law.    I refer to this Act of 1868 for the purpose of
meeting an argument in the opinion of the Court, and
not for the reason that I consider it necessary to sustain
the position I have taken, as to the authority of the
Commissioners of Wilkes County to submit this ques-
tion to the voters, and to subscribe the stock, and to is-
sue the bonds.

The charter provides for submitting the question to a
vote of the people in almost, if not the language of the
Constitution of 1868, with the single exception, that it
shall be sufficient if a majority of the qualified voters
"voting thereon shall be in favor of the subscription."
To this extent, and no further, did the Constitution of
1868 conflict with the provisions of this charter; and
this was cured by Section 1997 of *The Code,* which was
admitted to have been passed as the Constitution re-
quires, and which provides that it shall take a majority
of the qualified voters of the county to authorize the
subscription, as was done in this case.    Suppose that
Section 1997 of *The Code* had been passed by the Leg-
islature, as an amendment to this charter, with all the
formalities and requirements of the Constitution: would
it be contended that the submission was without legis-
lative authority and that these bonds were void ?    And
if not, why is it that a general law, applying to all cases
of submission, has not the same effect ?

The next ground upon which the court rests its opinion is that of estoppel. ·This ground of alleged invalidity to the bonds arises in this way : the Legislature at its February session (1879) attempted to pass, and did pass an Act providing for the extension of the North-Western North Carolina Railroad from Winston to Wilkesboro, for the subscription of counties to its capital stock, and the issue of bonds.   But it is claimed by the plaintiff, and such appears to be the fact, that this Act did not receive the three several readings, on three several days, with a call of the yeas and noes, as provided by the Constitution; and for that reason, that the said Act is void under *Bank* v. *Commissioners*, 119 N. C., 214, and *Commissioners* v. *Snuggs*, 121 N. C., 400. But the Commissioners, when they issued these bonds, did not know that this Act was unconstitutional and void, and they recited in the bonds that they were issued under the Act of 1879.   This Act does not purport to be an original Act, but it is stated in the Act itself that it is an amendment to the ordinance of the Convention chartering said road.   So that any one seeing these bonds would be led by the statements therein to know that they depended upon authority derived from the original charter, that is, the ordinance of the Convention of 1868.   And it is claimed in the opinion of the court, that this recital in the bonds, put there by the plaintiffs, estops the holders and those representing them from showing any other authority in the commissioners, except the Act of the 20th of February, 1879, and that Act being void for the reasons heretofore stated, the Commissioners had no power to issue the bonds.   I admit that this Act is a nullity and cannot benefit the bondholders; and as it is void and can do them no good, it can do them no harm.

The court therefore upon this recital in the bonds, that they were issued under the Act of February 20, 1879, again rests its judgment upon the doctrine of estoppel, and holds that the bondholders and the defendants in this action are estopped to show that the commissioners had any other authority except the said Act of 1879.

With the greatest respect and deference to the opinion of the court, it seems to me that the doctrine of estoppel is not only misapplied, but that its use and purpose are misconceived in this application by the court. Estoppels are as to facts, and not of law. In such transactions as this, they are made to apply to a party stating the facts, and not to the party to whom they are stated. This seems to me to be elementary learning. But see Bigelow on Estoppel, pages 4, 5, 6 and 7, and 356 and note 1. "It is not the deed of the defendant but of Isham (the grantor) only, by whom alone it is executed ; and not being the deed of the defendant, it cannot as a deed estop him from denying that the grantor had title." And the same principle is held in the case of *Northern Bank* v. *Porter Township*, 110 U. S., 608, near the end of the opinion (cited by the court). In that case the bondholder was trying to estop the maker, by holding him to the statements in the bond. And the court says that the maker is estopped by the recital of such facts as it was supposed to have special knowledge of—such as that there had been a submission to a vote, and that a majority of the qualified voters voted for the bonds. But it was held that the defendant (the maker) was not estopped to show the law—to show that the township had no legal authority to make the subscription and to issue the bonds. If the maker of the bonds was not estopped by the recitals in the bond from showing the

want of legal authority to make the bonds, what rule of law or justice is there to estop the defendants, in this case, from showing that the commissioners of Wilkes County had the power—legal authority to issue these bonds ?

It is said in the opinion of the court that "estoppels are mutual" and as the plaintiff would be estopped by the recitals that the defendant must be. This rule obtains in many instances, but I deny its application in this case, as I have shown above from Bigelow on Estoppel and from *Northern Bank* v. *Porter Township*. But were I to admit the rule to be, that where one party is estopped, the other party is also, what would be the result of the reasoning of the court, when I have shown that the maker would not be estopped to show the want of power ?

The court in its opinion says that certain positions were strenuously insisted on by the defendant. I think this must be a mistake, as the case was not argued before us, either by brief or by oral argument, on behalf of the defendants. Mr. Turner and Mr. Welborn, by leave of court made themselves parties defendant after the action was brought, but they have given the case no further attention. Why they did this I do not know. The case appears to be a controversy so far as parties are concerned, for there are plaintiffs and there are defendants. But as to the conduct of the case before this Court is concerned, it has been unilateral. The opinion of the court speaks of the re-organization of the railroad company, thereby defrauding some one out of his stock. The record furnishes no evidence of any reorganization of the railroad company. It is stated in the opinion of the court that the Supreme Court of the United States is the only court authorized to review this opinion. I

agree with the court in this expression of opinion, but I have no idea that it will ever be reviewed by that court, as the case is decided in favor of plaintiffs, and the defendants have not taken interest enough in it to be represented by counsel, and it is not likely they will appeal.

It is said that the talk of repudiation has had no effect on the court, and I have no idea that it has. And I hope that my aversion to repudiation has had no influence on me in coming to the conclusions I have reached.

My opinion is that the bonds are valid and that their payment should be enforced by the courts.

FAIRCLOTH, C. J.: I concur in the dissenting opinion.