COMMISSIONERS OF STANLY COUNTY v. I. W. SNUGGS, Treasurer.

*Invalid Statute—Constitutionality of Statute Authorizing Creation of Debt and Levy of Taxes—Mandatory Requirements of Constitution as to Passage of Statutes—Journals as Evidence —Power of County to Issue Bonds under The Code, Section 1996, in Aid of Railroad Not Begun at Date of The Constitution—Purchasers of Municipal Bonds, Duty of.*

1. Section 14, Article 2, of the Constitution providing that no law shall be passed to raise money on the credit of the State or to pledge the faith of the State, directly or indirectly, for the payment of any debt, or to impose any tax upon the people of the State, or to allow the counties, cities or towns to do so unless the bill for the purpose shall have been read three several times in each house of the General Assembly and passed three several readings, which readings shall have been on three different days, and agreed to by each House respectively, and unless the *yeas and nays* on the second and third readings of the bill shall have been entered on the "Journal" is mandatory.

2. In the trial of an action to declare invalid bonds of a County issued in pursuance of the authority of an act of the General Assembly, it is competent to introduce in evidence the Journal of the House or Senate to show that such Act was not passed in conformity with the requirements of the Constitution, and when such Journal shows

COMMISSIONERS *v.* SNUGGS.

affirmatively that the act authorizing the creation of the indebtedness. or the imposition of a tax, was not passed with the formalities required by Section 14, Article 2, of the Constitution, such Journal is conclusive as against not only a printed statute published by authority of law, but also against a duly enrolled act, and such act is invalid so far as it attempts to confer the power of creating a debt or levying a tax. (*Bank* v. *Commissioners*, 119 N. C., 214, followed and *Carr* v *Coke*, 116 N C., 223, distinguished.)

3. A County has no power, under Section 1996 *et. seq.* of *The Code* and an affirmative vote of the qualified voters of the County, to issue bonds and levy a tax for their payment in aid of a railroad not begun before the adoption of the Constitution of 1868.

4. It is incumbent upon the purchasers of State, County and municipal bonds to ascertain whether the authority to issue them has been granted according to the requirements of the Constitution

FAIRCLOTH, C. J., dissents, *arguendo.*

CIVIL ACTION commenced in the Superior Court of STANLY County to enjoin the payment of the interest on certain bonds issued by Stanly County in aid of the Yadkin Railroad Company and heard on the return of the motion to show cause, &c., before *Coble, J.,* at Chambers. From an order continuing the injunction to the hearing the defendant appealed.

*Messrs. A. C. Avery, D. Schenck, Jr.,* and *Shepard & Busbee,* for plaintiffs.
*Messrs. Long & Long* and *Battle & Mordecai,* for defendant (appellant).

MONTGOMERY, J.: On the 15th of August, 1889, at an election held in Stanly County, a majority of the voters of the County cast their ballots in favor of subscription to the capital stock of The Yadkin Railroad Company to the amount of One Hundred Thousand Dollars. Bonds of the County to that amount were issued in payment of the subscription and delivered to the President of the Company. The annual interest has been paid regularly except that accruing on the first of July, 1897, which has been collected

and is now in the hands of the defendant, who is the treasurer of the County, and who is about to pay it to the holders of the coupons. The plaintiffs, tax payers of the County and the Board of Commissioners, bring this action alleging that the Acts of 1870–'71, Chapter 236, and the Acts of 1887, Chapter 183, under which the commissioners attempted to act and under which the election was held, were void for the reason that they were not passed as required by Section 14 of Article II of the Constitution, and that the bonds were therefore illegally issued, and they pray that the Treasurer of the County, the defendant, be perpetually enjoined from paying the sum now in his hands or any other sums which may hereafter come into his hands to the holders of the coupons. The matter was heard before *Coble, Judge,* and the restraining order theretofore granted was continued and the defendant enjoined from paying out the money in his hands until the final hearing of the case.

The act of incorporation of the Yadkin Railroad Company, Chapter 236 of the Laws enacted by the General Assembly of North Carolina at its session of 1870–'71, in its fourth section, made provision for subscription to be made to the capital stock of the company by any County along the line of the road to such amount as a majority of the County Commissioners might determine, subject to the approval of the qualified voters of the County, the Commissioners, in order to pay the subscriptions, being empowered to issue bonds for that purpose and to levy taxes to pay the bonds and interest upon them. Section 4 of the Act of Incorporation was amended by Chapter 183 of the Laws of 1887, the amendment extending the privilege of subscribing for stock of the company to the towns and cities and townships along the line of the road and requiring the subscriptions to be approved by a majority of the qualified voters of such cities, towns and townships, and providing

further that bonds should be issued in payment of said sub-scription and taxes levied to pay the same, principal and interest, according to the terms and conditions of said bonds, and that the board of commissioners of the County should issue the bonds and levy the taxes to pay the township sub-scriptions. Section 14 of Article II of the Constitution ordains that "No law shall be passed to raise money on the credit of the State or to pledge the faith of the State, directly or indirectly, for the payment of any debt, or to impose any tax upon the people of the State, or to allow the Counties, cities or towns to do so, unless the bill for the purpose shall have been read three several times in each House of the General Assembly, and passed three several readings, which readings shall have been on three different days, and agreed to by each House respectively, and unless the yeas and nays, on the second and third reading of the bill shall have been entered on the Journal."

The plaintiffs were allowed to produce copies of the House Journal certified to by the Secretary of State, to show that the above mentioned Acts were not passed by the General Assembly in accordance with the requirements of the Con-stitution. That Journal showed that the bill which became Chapter 236 of the Laws of 1870–'71 was introduced on the 31st of March, 1871, and referred to the committee on in-ternal Improvements; that it was reported favorably on the next day, and that on the 3rd of April, two days after its introduction, it passed its second and third readings, and that there was no entry of the yeas and nays on either of its readings. From that Journal it appears that the bill which was enacted into Chapter 183 of the Laws of 1887 passed its second reading on February 26 and that the yeas and nays were called on that reading and entered on the Journal; that the bill passed its third reading on the 28th of February but the yeas and nays were not entered on the journal on that reading.

We are of the opinion that it was competent to introduce the House Journal as proof that the Acts referred to were not passed according to the requirements of the Constitution, and they established that fact. That provision of the Constitution (Section 14 of Article II) is mandatory, as we have decided in *Bank* v. *Commissioners*, 119 N. C., 214. It is the protection which the people, in convention, have thrown around themselves for the benefit of the minority as well as of the majority. The object of the provision was to prevent hasty and ill-advised legislation by means of which the people might be deprived of their property not for the ordinary expenses of government but, by special taxation, for enterprises ostensibly in the name of the public good, but which might prove sources of individual injustice and injury. When indebtedness of the kind mentioned in the provision is sought to be incurred, the people have said in that provision that their legislative body, whenever considering the propriety of authorizing it, shall be not only careful but *deliberate;* that the bill shall be read three several times and pass three several readings, and that no two readings of the bill shall be had on the same day, and that the names of the legislators who vote on the question shall be known to the people in the enrollment of their names on the Journal. It is a reasonable requirement, too, and especially serviceable to those who are property holders and tax-payers, and the information is easy to be had by all who may be interested, for Section 16 of the same Article of the Constitution ordains that each House shall keep a Journal of its proceedings which shall be printed and made public immediately after the adjournment of the General Assembly.

Therefore, it is clear that in legislation in reference to raising money on the credit of the State or pledging its faith to the payment of debt, or imposing any tax on the people of the State, or allowing the Counties, cities, or towns to do

so, the Constitution itself ordains that such legislation is void unless the bills have passed three separate readings, on three different days, and unless the yeas and nays on the second and third readings shall have been entered on the Journal. The bill may, in point of fact, have been read three several times and on three different days, and the yeas and nays may have been actually called on the second and third readings and the presiding officers may have certified thereto, and yet, if the entry of the yeas and nays is not actually made on the Journal, the Constitution speaking with absolute clearness says that the failure of such entry is *absolutely* fatal to the validity of the Act. The entry, showing who voted on the bill and how they voted, must be made before the bill can ever become a law. The Constitution does not allow the certificate of the presiding officers or any other power to cure such an omission. The certificate of these officers will be taken as conclusive of the several readings in ordinary legislation, even if it could be made to appear that the journals were silent in reference thereto, because, in ordinary legislation, the directions of the Constitution are not a condition precedent to the validity of the Act. But, in that class of legislation, the purpose of which is to legislate under Section 14 of Article II of the Constitution, a literal compliance with the language of that section is a condition precedent and one which must be performed in its entirety before the bill can ever become a law. This point, however, has been so recently and so thoroughly discussed in the case of *Bank* v. *Commissioners*, *supra*, that it will be unprofitable to enter into another protracted discussion of it here. The authorities there cited are numerous and most of them directly in point.

This case is clearly to be distinguished from that of *Carr* v. *Coke*, 116 N. C., 223, and the difference cannot be pointed out more clearly than was done by CLARK, J., who deliv-

ered the opinion in *Bank* v. *Commissioners, supra,* in the following language: "This case has no analogy to *Carr* v. *Coke,* 116 N. C., 223. That merely holds that when an Act is certified to by the speakers as having been ratified it is conclusive of the fact that it was read three several times in each House and ratified. Const. Art. II, Sec. 23. And so it is here; the certificate of the speakers is conclusive that this Act passed three several readings in each House and was ratified. The certificate goes no further. It does not certify that this Act was read on three several days in each House and that the yeas and nays were entered on the Journals. The Journals were in evidence and showed affirmatively the contrary. The people had the power to protect themselves by requiring in the organic law something further as to Acts authorizing the creation of bonded indebtedness by the State and its Counties, cities and towns, than the fact certified to by the speakers of three readings in each House and ratification: This organic provision plainly requires for the validity of this class of legislation in addition to the certificates of the speakers, which is sufficient for ordinary legislation, the entry of the yeas and nays on the Journals on the second and third readings in each House. It is provided that such laws are "no laws" *i. e.,* are void unless the bill for the purpose shall have been read three several times in each House of the General Assembly and passed three several readings, which readings shall have been on three different days and agreed to by each House respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the Journal."

But the defendant for his protection presents the view that, even if it be conceded that the Acts above referred to were not passed according to the requirements of the Constitution and for that reason might be held void by this Court, yet the commissioners of the County had the right to submit

the question of subscription, embracing the question of issue
of bonds and the levy of taxes to pay the same, principal
and interest, to the voters of the County, and, upon approval
by a majority of the qualified voters to issue the bonds under
Sections 1996, 1997, 1998, 1999 and 2000 of *The Code.*   All
the Sections of *The Code* were enacted by having been read
three several times in each House of the General Assembly,
having passed three several readings on three different days
in either House, the yeas and nays on the second and third
readings having been entered on the Journals of the Senate
and House of Representatives respectively.

But did the sections above mentioned give additional and
complete authority to order the election, issue the bonds and
levy the taxes to pay them, principal and interest?   Section
1996 is in these words: "The Boards of Commissioners of
the several counties shall have power to subscribe stock to
any railroad company or companies when necessary to aid
in the completion of any railroad in which the citizens of
the County may have an interest."   It will be necessary, in
order that that Section may be construed to give authority
to the Commissioners to issue the bonds, that the language
should include a railroad not begun to be built before the
subscription was made; that the word *"completion"* should be
construed building or construction, extending even to the
building of a new road; for in the case before us it appears
that the road had not begun to be built.   We cannot see
why the word "completion" should be thought to have been
used by the legislators in any other sense than the one most
usual and natural.   Ordinarily, the words "to complete"
are understood to mean to finish, to fulfill, and the word
"completion" to mean the finishing or accomplishing in full
of something which has already been commenced, as for in-
stance, it is most frequent to hear the word "completion"

used in connection with the finishing years and months of
the education of the young.    It is said of the young man or
the young woman that he or she has gone for this year or
this session to a certain university for the completion of his
or her education; the training or educational process having
been going on for years.

If there is uncertainty as to the meaning of the word
"completion" as used in Section 1996 of *The Code*, we might
invoke the aid of Section 4 (formerly 5) of Article V of the
Constitution, in its analogy to the *Code* section, to clear it
up.    The part of that section of the Constitution pertinent
to this matter reads as follows: "And the General Assembly
shall have no power to give or lend the power of the State
in aid of any person, association or corporation, except to aid
in the *completion* of such railroads as may be *unfinished* at
the time of the adoption of this Constitution, or in which
the State has a direct pecuniary interest, unless the subject
be submitted to a direct vote of the people of the State, and
be approved by a majority of those who shall vote thereon."

Thus it appears that all gifts or loans by the State in aid
of the completion of such railroads as had been begun but
which were unfinished at the time of the adoption of the
Constitution, or in which the State has a direct pecuniary
interest, could be made valid by simple Act of Legislation.
The Act of 1868–'9, Chapter 171 (now Sections 1996, 1997,
1998, 1999 and 2,000 of *The Code*) was enacted a few days
more than a year after the ratification of the Constitution of
1868.    It is most reasonable to conclude that the policy and
purpose of both the Constitutional provision and the Statute
were the same, the only difference being that in case of State
aid no approval by a vote of the people was required, while
a majority vote of the people was required in cases of County
aid.    The object of the Statute must have been to provide
by a general Act means by which the counties, without

special legislation for each County by separate bills, might be enabled to complete unfinished railroads in which the Counties had a pecuniary interest. At the time of the enactment of the Statute of 1868–'9 and always since that time any County of the State, duly observing the limitations of Section 7 of Article VII of the Constitution and under an Act passed according to the requirements of Section 14, Article II of the Constitution, could and can subscribe to the capital stock of the railroad company whether unfinished or to be begun. The Act of 1868–'9 however, considering the condition of affairs then existing, that is, that there were Counties which had a pecuniary interest in railroads that had been begun but were unfinished, enabled such counties to make subscriptions of bonds to complete such unfinished roads at the earliest moment and with the least cost, by a general law passed according to Section 14, Article II of the Constitution. This reasoning leads us to the still further conclusion that, at the time when the Act of 1868–'9 was brought forward in *The Code*, Section 1996, and the four succeeding Sections, it could have had reference to no cases except those where the Counties had a pecuniary interest in unfinished railroads at the adoption of the Constitution of 1868, and that, therefore, *The Code* Sections could not apply to the present case, because the Yadkin Railroad was not begun to be constructed until about 1889.

We have given to the matters embraced in this case a patient and thorough consideration. We are aware of the hardships and losses that may follow from our decision, and we are also aware of the probable complaints likely to be made by persons interested. But the Constitutional requirement which we have discussed is clear in its meaning and in its language, and it is also mandatory. We must obey it in our interpretation of its meaning. Investors in such securities who may meet

with losses have no one to blame but themselves, for the Journals of the General Assembly are open to public inspection, and the Constitution of the State is a part of the public literature.   The purchaser of real estate with us must look to the depository of his title for the security of his purchase, and so must the investors in our State and County and municipal bonds look to the Constitution and the laws for the safety of their investments.

We find no error in the ruling of the Court below.

No error.

FURCHES, J. concurring:   As I concurred in the opinion of the Court in *Carr* v. *Coke*, 116 N. C., 223, and also in the opinion of the Court in *Bank* v. *Commissioners*, 119 N. C., 214; and as it was claimed on the argument in this case that the two opinions were in conflict, and could not stand together, I propose, in addition to the well considered opinion of Justice MONTGOMERY, to say briefly, what seems to me to constitute the distinction between the two cases.

The power to legislate is not conferred on the General Assembly by the Constitution.   This it has without an express delegation of power.   There are instances where the legislature is commanded to legislate.   But these are the exception to the general rule and have nothing to do with the Act we are considering.   The most of the provisions of the Constitution with regard to legislation are restraints upon its power.

The Act considered in the case of *Carr* v. *Coke*, was passed under the general and inherent right to legislate.   This being so, it fell under the general parliamentary law of authentication, and the signature of the presiding officers was final.   But the Act now under consideration was passed under one of the restrictions or prohibitions placed upon the legislature by the Constitution, Art. 2, Sec. 14, which pro-

vides "that no law shall be passed to raise money on the credit of the State, &c., unless it be read on three several days in each House, and on the two last readings the yeas and nays are taken and recorded and this rule applies to counties, towns, cities, &c.

It must be admitted that the Constitution might have prohibited the legislature from passing any Act to lend its credit, or to authorize any county, or town to do so. Suppose, then, that the Constitution had prohibited the enactment of any such law, but notwithstanding this inhibition the Legislature had passed such an act, and the presiding officers had signed and ratified it, should the Courts have gone on and enforced this Act because it had passed and ratified by the presiding officers of the two Houses? And if not, why should this Act be enforced, passed in a way in which the Constitution says it shall not be passed—so as to authorize a County to raise money upon its credit?

Suppose the Legislature should pass an Act providing for the payment of the special tax bonds, or the interest thereon, and the bill should be signed and ratified by the presiding officers of each body of the General Assembly: should this Court enforce this Act? I must suppose that the answer to this proposition would be no; that the Constitution prohibits the Legislature from passing such an Act. And, if such an Act as this could not be enforced because the Constitution prohibits its enactment, it would be difficult to draw the distinction and to see how we could enforce this Act, passed in a way the Constitution says it should not be passed.

I have had trouble in coming to the conclusion that we, as a co-ordinate department of the government, could look to the manner of its passage. But upon further consideration of the matter, I have come to the conclusion that these rules, preventing us from looking behind the ratification, are only applicable to Acts passed under the general power

of legislation. The precedents I have examined grew out of legislation under the general unrestricted power as to legislation. To adopt this rule with regard to restricted or prohibited powers would be, in effect, to destroy these restrictions, these wise and beneficent provisions of the Constitution. In this it seems to me, lies the distinction between *Carr* v. *Coke* and *Bank* v. *Commissioners*, and this case falls under the rule governing in *Bank* v. *Commissioners.*

It is claimed that this is an Act of repudiation on the part of plaintiffs, and repudiation is not more distasteful to any one than it is to me. And it may be in a moral sense repudiation, but it cannot be in law, as the plaintiffs were never legally bound for these bonds.

CLARK, J., concurring: So far from the decision in *Carr* v. *Coke*, 116 N. C., 223, conflicting with the decision of this case, it is the strongest vindication of the wisdom and necessity of placing Article 14, Section II, in the Constitution. In *Carr* v. *Coke*, the majority of the Court felt constrained to hold that a bill of a general legislative nature and not imposing a tax, when authenticated by the certificate and signatures of the Speakers, could not be impeached, though it was averred in the complaint and shown by the Journals that such bill had, in fact, been tabled on the second reading in the House in which it had been introduced, and consequently had not reached the other House at all. This being so, if the people should desire by constitutional amendment or by a provision inserted by a constitutional convention to require other safeguards of the actual passage of laws than the signatures of the Speakers, can there be any doubt that they have the power to do so? Now, as to the passage of the class of bills specified in Section 14, Article II, they had the foresight to do this very thing and to require additional guarantees by providing that such

bills should not become laws unlesss read on three different days in each House and unless "the yeas and nays on the second and third readings *shall have been entered* on the Journal," which Journal, Section 16, of the same Article requires to be "printed and made public immediately after the adjournment of the General Assembly." As to such matters, in which great amounts of money are at stake, the public were not willing to run the risk of bills being palmed off as Statutes through the inadvertence of the Speakers or the venality of Clerks of the General Assembly, without having, in fact, been enacted. These additional requirements are not mere technicalities, but indispensable safe-guards which experience has caused to be inserted in the Constitutions of many of the States to protect the public against the grossest abuses in the creation of indebtedness or authorizing taxation by the State, Counties and towns. *Carr* v. *Coke* holds that as to bills not embraced in Section 14 Article II, the certificate of the Speakers is conclusive evidence of passage and the Courts are powerless to go behind their signatures. The decision in this case holds that, as to the class of bills referred to in Section 14, such certificate is expressly made not sufficient, and the bills are not laws unless the additional requirements of that Section appear by the Journal to have been complied with.

There is no conflict between the two decisions, and this has heretofore been pointed out in *Bank* v. *Commissioners*, 119 N. C., 214.

FAIRCLOTH, C. J., dissenting: The facts are stated in the opinion of a majority of the Court and I will simply state my position briefly. My reasoning is stated in *Carr* v. *Coke*, 116 N. C., 223. In that case it was held that where a bill had been duly signed by the presiding officers of the Assembly, the Court cannot go behind such ratification to

inquire how the bill was passed. The ratification is a record and concludes the matter. It does not certify that the bill was read three times or a less number of times. *Omnia presumunter*, etc. It is argued, however that the case above stated applies when the Assembly is legislating under its inherent power unrestricted by the Constitution, and that that principle does not apply when legislating under restricted clauses of the Constitution, as in this case under Article II, Section 14, *i. e.*, that in one instance the ratification is a record and conclusive, and in the other instance the ratification means nothing because one section of the Constitution is restrictive and the other is not. I cannot reach that conclusion.

Article II, Section 14, saying that no law shall be passed to allow Counties, etc., to raise money on their credit, etc., unless the bill shall have been read three times, etc., is a restriction directed to the Legislature, and no such indebtedness can be imposed except by a majority vote of the tax payers at the ballot box. That Article and Section do not declare that any legislative Act under it is void, but leaves much to the judgment and discretion of the Legislature.

But is the distinction well taken? Article II, Section 12, declares that, "The General Assembly shall not pass any private law unless it shall be made to appear that thirty days notice of the application to pass such a law shall have been given, under such direction and in such manner as shall be provided by law." This is a restrictive clause, and yet in *Brodnax* v. *Groom*, 64 N. C., 244, it was held by this Court that if a private Act for the purpose of levying a special tax for the County be certified by the presiding officers of the two branches of the Legislature, as duly ratified, it is not competent for the judiciary to go behind such *record* and inquire collaterally whether the thirty days notice of an application therefor, required by the Constitution, had

been given. Pearson, C. J., said: "We do not think it necessary to enter into the question whether this is a public local Act or a mere private Act, in regard to which thirty days notice of the application must be given; for, taking it to be a mere private Act, we are of opinion that the ratification certified by the Lieutenant Governor and Speaker of the House of Representatives makes it a "matter of record" which cannot be impeached before the Courts in a collateral way. Lord Coke says "a record, until reversed, importeth verity." There can be no doubt that Acts of the Legislature, like judgments of Courts, are matters of record, and the idea that the "verity of the record" can be averred against in a collateral proceeding is opposed to all of the authorities." The Courts must act on the maxim, *omnia presumuntur*, etc. And so, if the distinction is sought to be applied to the many sections of the Constitution on various subjects, whether restrictive or general, the law might change as each case was presented.

The Legislature has a general power to levy and raise taxes. Article V, Section 1. When the *power* of taxation is conferred, it is difficult for the Courts to enforce restraints imposed by the Constitution upon the *procedure* of the Legislature in passing the necessary laws for the exercise of the *power*. That is saying to a co-ordinate branch of the Government, "you have not done your work or duty with a proper degree of precision and we will declare it. void." When the prohibition is absolute, then the Courts may declare the result void, not on the ground of irregularity in the Legislative proceedings, but because the *power* does not exist, whether the proceedings were regular or irregular. For instance, Article I, Section 1, declares that, "The State shall never assume or pay or authorize the collection of any debt or obligation, express or implied, incurred in aid of

121—52

insurrection or rebellion against the United States" unless the proposition to pay such debt shall be submitted to the people and ratified by them by the vote of a majority of all the qualified voters of the State, at a regular election held for that purpose. Here, we find a restriction, not on the procedure of a co-ordinate branch, but an absolute prohibition and denial of *power*, which the Courts can see on the face of the Constitution, without looking at the Journals of the Assembly, and without impeaching the record of ratification.

It is argued that the legislative Journals are public documents and open to the inspection of the purchasers of the bonds in question. That is true, and it is equally true that they were open to the plaintiffs and the tax payers of Stanly County when they held forth these bonds to the public and received the money for them and invested the same for the permanent improvement and benefit of their County. They have recognized and paid the annual interest on their bonds for several years without objection, and it is *possible* that they never discovered the absence of the words "yea" and "nay" on the Journals, until since the decision of this Court in *Bank* v. *Commissioners*, 119 N. C., 214.

I think the true principle is found in the first two cases cited *supra*.