BOARD OF COM'RS OF WILKES COUNTY et al. v. COLER et al.

(Circuit Court of Appeals, Fourth Circuit. February 4, 1902.)

No. 319.

1. MUNICIPAL BONDS—AUTHORITY TO ISSUE—EFFECT OF RECITALS.

The recital in municipal bonds that they were issued under an act which is invalid does not preclude inquiry as to whether there was other valid legislative authority under which the power to issue them can be upheld.

2. SAME—ESTOPPEL BY RECITALS.

A recital in county bonds of facts precedent to their issuance, which it was the province of the county officers to determine, is conclusive upon the county in favor of a bona fide holder.[1]

3. STATUTE—CONSTITUTIONALITY OF ENACTMENT—PARTIAL INVALIDITY.

The fact that a statute, among other things authorizing a county to issue bonds, was not enacted in conformity to the mandatory requirements of the state constitution relating to that class of legislation, does not render it invalid as to its other provisions, to which such constitutional requirement does not apply.

4. MUNICIPAL BONDS—AUTHORITY TO ISSUE—CONSTRUCTION OF STATUTE.

The constitutional convention of North Carolina on March 9, 1868, passed an ordinance chartering a railroad company to construct a railroad from a point on another road "to some point in the northwestern boundary line of the state to be hereafter determined." It located the western terminus of the eastern portion of the line, which, when completed, should constitute "its first division." It further provided that all counties or towns subscribing to the stock of the company should do so "in the same manner and under the same rules, regulations and restrictions" as prescribed in the charter of another company previously incorporated, and such charter authorized "any town or county near or through which" the road might pass to subscribe for stock on a vote of the inhabitants, and to issue bonds in payment therefor. Such ordinance was held by the supreme court of the state to be valid, to continue in force after the adoption of the constitution, and to authorize the issuance of bonds in payment for stock of the company by a county into which the first division of the road extended as located by the ordinance. *Held*, that it conferred like power upon another county into which the road was extended under a subsequent act of the legislature, and that bonds voted and issued by such county in conformity to its requirements were valid obligations, although they purported to have been issued under the subsequent act, which, in so far as it attempted to authorize their issuance, was void.

Goff, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western District of North Carolina.

A. C. Avery and James E. Shepherd, for appellants.

Charles Price (John F. Dillon, Harry Hubbard, and John M. Dillon, on the brief), for appellees.

Before GOFF, Circuit Judge, and MORRIS and BOYD, District Judges.

MORRIS, District Judge. This is a suit to determine the validity of certain bonds issued by Wilkes county, N. C., in aid of the con-

[1] Bona fide purchasers of municipal bonds, see note to Pickens Tp. v. Post, 41 C. C. A. 6.

struction of the second division of the railroad constructed by the Northwestern North Carolina Railroad Company, incorporated in 1868; the second division being from the towns of Winston and Salem, up the valley of the Yadkin, by way of Jonesville and Wilkesboro, in the county of Wilkes, to Patterson's Factory, in the county of Caldwell. After hearing argument in this appeal at the November term, 1899, this court certified to the supreme court of the United States three questions: First, whether this court was controlled in dealing with the case by certain decisions of the supreme court of North Carolina in connection with article 2, §§ 14, 16, article 5, §§ 1, 4, 6, 7, and article 7, § 7, of the constitution of North Carolina, adopted April 24, 1868; second, whether, if there was no decision of the supreme court of North Carolina adverse to the validity of the bonds at the time when the appellees acquired them for a valuable consideration without notice, they were valid in the hands of the appellees; third, whether when the appellees acquired the bonds any decision then announced by the supreme court of North Carolina was adverse to the validity of the bonds which affected them in the hands of the appellees. The bonds were dated October 21, 1889, and each one contained the following recital:

"This bond is one of a series of one hundred issued by authority of an act of the general assembly of North Carolina ratified on the 20th day of February, A. D. 1879, entitled 'An act to amend the charter of the Northwestern North Carolina Railroad for the construction of a second division from the towns of Winston and Salem, in Forsyth county, up the Yadkin valley by Wilkesboro to Patterson's Factory, Caldwell county,' and authorized by a vote of the majority of the qualified voters of Wilkes county, by an election regularly held for that purpose, on the 6th day of November, A. D. 1889, and by an order of the board of commissioners of Wilkes county, made on the first day of April, A. D. 1889. This series of bonds is issued to pay the subscription of one hundred thousand dollars, made to the capital stock of the Northwestern North Carolina Railroad Company by said county of Wilkes."

Article 2, § 16, of the constitution of North Carolina, adopted April 24, 1868, provided that no law should be passed authorizing a county to raise money on its credit, or impose a tax, unless the bill for the purpose was read three several times in each house of the general assembly, and passed three several readings on different days in each house, and unless the yeas and nays on the second and third readings of the bill were entered on the journals. The supreme court of North Carolina in Commissioners v. Call, 123 N. C. 308, 31 S. E. 481, 44 L. R. A. 252; Union Bank of Richmond v. Commissioners of Town of Oxford, 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487; Commissioners v. Snuggs, 121 N. C. 394, 28 S. E. 539, 39 L. R. A. 439; Rodman v. Town of Washington, 122 N. C. 39, 30 S. E. 118; Commissioners v. Payne, 123 N. C. 432, 31 S. E. 711,—all cases involving the validity of county bonds,—has held that the provisions of the constitution of North Carolina requiring the entry of the yeas and nays on the journals was imperative, and the failure of such entry was absolutely fatal to the validity of the legislation, so far as it undertook to authorize the county to issue bonds in aid of a railroad. In Commissioners v. Call (1898) the validity of the bonds of the issue now in suit was called in question, and the supreme court of North Carolina

declared that the act of February 20, 1879, under which these bonds are recited to have been issued, was never legally passed so as to become a law giving authority to issue the bonds, for the reason that the yeas and nays were not entered upon the journals. To the questions certified by this court the supreme court of the United States gave the most thorough consideration, and held, Mr. Justice Harlan speaking for the court (Wilkes County v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642), that the circuit court was bound by the decisions of the supreme court of North Carolina construing their own state constitution, and holding that the legislative enactments of 1868, 1879, and 1881 were not validly enacted, so as to give Wilkes county power to issue these bonds. But the supreme court of the United States further ruled that notwithstanding the invalidity of the act of February 20, 1879, the bona fide holders of the bonds might look to any valid legislation giving power to issue them, and that whether or not there was such power was to be determined by the law of North Carolina, as declared by the supreme court at the time the bonds were put upon the market. Mr. Justice Harlan, speaking for the court, said:

"But the Belo Case, 76 N. C. 489, involved other considerations. Forsyth county (whose liability on the bonds in suit in that case was directly involved) made the point that it had no authority to issue such bonds. The court, however, held that such authority was conferred by the convention ordinance of March 9, 1868, and the subscription and bonds made in the name of that county to the Northwestern North Carolina Railroad Company were upheld as valid under that ordinance, which was recognized as part of the law of the state and as conferring authority on the county of Forsyth to do what it did. It results that when the bonds here in question were issued, in 1889, it was the law of North Carolina that the ordinance of 1868, constituting the charter of the Northwestern North Carolina Railroad Company, was not superseded by the constitution of 1868, but was in force, and, therefore, gave power to the counties embraced by its provisions to take stock in that company and pay for it in county bonds, just as Forsyth county had done."

Mr. Justice Harlan then calls attention (page 531) to the rule that as in 1877 in the Belo Case the supreme court of North Carolina had recognized the power of the counties embraced within the provisions of the convention ordinance of 1868 to issue bonds to pay for stock in this same railroad, when the power was exercised by a county under the restrictions imposed by the constitution of 1868, that is to say, "not unless by a vote of a majority of the qualified voters therein," that no subsequent decision of the supreme court of North Carolina, made after county bonds had been put upon the market, could alter vested rights by holding that the constitution of 1868 abrogated the power given by the convention ordinance, and by holding that no subscription in aid of a railroad could be made except by virtue of a new statute passed in conformity to the requirements of section 14 of article 2, and thus invalidate bonds issued before the rendering of such a decision. The supreme court of the United States, while recognizing that the Belo Case (76 N. C. 489) and the Hill Case (67 N. C. 367) had held that the convention ordinance of 1868 gave power to the counties embraced within its terms to issue bonds such as those now in suit, declined to consider, under the questions certified by this court, whether Wilkes

county was embraced within the general powers of that ordinance, and suggested the following as some of the various questions which might arise in considering whether Wilkes county had the power under that ordinance, unassisted by any of the subsequent enactments, to issue the bonds sued on in the present case, viz.:

"Did the general power given by that ordinance to the Northwestern North Carolina Railroad Company to construct a railroad from its eastern terminus, 'running by way of Salem and Winston, in Forsyth county, to some point in the northwestern boundary line of the state to be hereafter determined,' invest Wilkes county with authority to subscribe to the stock of the company and to issue bonds in payment of such subscription? Was Wilkes county in the same category with Forsyth county? Was the route of the road northwest of Salem and Winston to some point in the northwestern boundary line of the state to be determined by the legislature or by the company? If by the legislature, was that route ever determined otherwise than by the act of 1879, which has been adjudged never to have become a law of the state? Did Wilkes county have authority, under the ordinance of 1868 alone, to aid by a subscription of stock and bonds the construction of the second division of the road referred to in the act of 1879, extending from the towns of Winston and Salem up the valley of the Yadkin by way of Jonesville and Wilkesboro, in the county of Wilkes, to Patterson's Factory, in the county of Caldwell?"

The supreme court said:

"These are matters about which we do not feel disposed to express an opinion under the very general and indefinite questions certified from the circuit court of appeals. Nor do we deem it proper to express any opinion as to the scope and the effect upon the rights of the parties of sections 1993–1999 of the Code of North Carolina."

The recitals of the bonds in suit are as follows: (1) That the bond is issued by authority of an act of the general assembly of North Carolina ratified the 20th day of February, A. D. 1879. This act being an invalid enactment, and not a law, so far as it undertakes to give power to issue bonds, this recital does not preclude inquiry as to whether or not there was such a law, and the existence of legislative authority. Northern Nat. Bank v. Trustees of Porter Tp., 110 U. S. 608, 4 Sup. Ct. 254, 28 L. Ed. 258. But the recital of an invalid act does not preclude inquiry as to whether there was in existence any other valid legislative authority under which power to issue the bond could be upheld. Wilkes Co. v. Coler, 180 U. S. 506, 524, 21 Sup. Ct. 458, 45 L. Ed. 642; Board of Commissioners v. Beal, 113 U. S. 227, 5 Sup. Ct. 433, 28 L. Ed. 966; Commissioners v. January, 94 U. S. 202, 24 L. Ed. 110; City of Evansville v. Dennett, 161 U. S. 434, 443, 444, 16 Sup. Ct. 613, 40 L. Ed. 760; Knox County v. Ninth Nat. Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93. (2) The second clause of the recital is to the effect that the bond is authorized by a vote of the majority of the qualified voters of Wilkes county by an election regularly held for that purpose on the 6th day of November, A. D. 1889, and by an order of the board of commissioners of Wilkes county, made on the 1st day of April, A. D. 1899. This is a recital of facts which it was for the board of commissioners of Wilkes county to ascertain and decide, and which, therefore, the county is estopped from denying as against a bona fide holder. Board of Commissioners v. Beal, 113 U. S. 227, 229, 5 Sup. Ct. 433, 28 L. Ed. 966; Gunnison County v. E. H. Rollins & Sons, 173 U. S. 255, 19 Sup. Ct. 390, 43

L. Ed. 689. (3) The bond further recites that, "This series of bonds is issued to pay the subscription of $100,000 made to the capital stock of the Northwestern North Carolina Railroad Company by said county of Wilkes." This recital is in the same way conclusive of the facts therein stated.

The question now to be passed upon, therefore, is whether, independent of the invalid legislative enactments attempted to be passed subsequent to the convention ordinance of March 9, 1868, Wilkes county had the power under that ordinance to submit the stock subscription to the vote of the qualified voters, and upon authorization by a majority of the votes to issue the bonds and levy taxes to pay the interest and principal. If Wilkes county was in the same category with Forsyth county, the supreme court of North Carolina adjudged in the case of Belo v. Commissioners (1877) 76 N. C. 489, that the power was conferred by the ordinance of the convention, and this ruling remained undisturbed by any subsequent adjudication of the supreme court of North Carolina, and until after these bonds were issued. The power thus held to be sufficient to authorize Forsyth county to subscribe to the stock of this railroad and issue bonds in payment is to be found in the following sections of the ordinance to incorporate the Northwestern North Carolina Railroad Company, ratified March 9, 1868:

"Section 1. That for the purpose of constructing a railroad of one or more tracks from some point on the North Carolina railroad between the town of Greensboro, in Guilford county, and the town of Lexington, in Davidson county, running by way of Salem and Winston, in Forsyth county, to some point in the northwestern boundary line of the state, to be hereafter determined, a company is hereby incorporated under the name and style of the Northwestern North Carolina Railroad Company, etc."

"Sec. 2. Be it further enacted that the capital stock of said company may be created by subscriptions on the part of individuals, corporations and counties in shares of one hundred dollars."

Section 5 provides that the president and directors shall proceed to locate the eastern terminus of the road and proceed at once to construct said road in five mile sections to the towns of Winston and Salem, in Forsyth county, which portion of the railroad when completed "shall constitute its first division."

Sections 8 and 9 provide that the state should loan its bonds to the railroad company as each five miles is graded and ready for its superstructure to the amount of $10,000 per mile upon the security of a first mortgage of the entire road and its property.

Section 12 is as follows:

"Be it further ordained that the stockholders of said company may pay the stock subscribed by them either in money, labor or materials for constructing said road as the board of directors may determine, and that all counties or towns subscribing stock to said company shall do so in the same manner and under the same rules, regulations and restrictions as are set forth and prescribed in the act incorporating the North Carolina and Atlantic Railroad company, for the government of such towns and counties as are now allowed to subscribe to the capital stock of said company."

"Section 13. Be it further enacted that the company shall have the power to construct branches of said road, one of which shall run from the towns of Winston and Salem, by way of Mount Airy, in Surry county, to the line of the State of Virginia."

Section 33 of the charter of the North Carolina & Atlantic Railroad Company, passed in 1852, c. 136, is as follows:

"Sec. 33. Be it further enacted that it shall be lawful for any incorporated town or county near or through which said railroad may pass to subscribe for such an amount of stock in said company as they shall be authorized to do by the inhabitants of said town or the citizens of said county in manner and form as hereafter provided."

Sections 34, 35, 36, and 37 provide the manner in which the vote of the qualified voters of the counties shall be taken and, if a majority of the qualified voters voting upon the question are in favor of the subscription, provide how the subscription shall be made, and that the county shall negotiate a loan or loans, and shall levy taxes to pay the principal and interest.

It will be seen by reading the sections of the charter of the North Carolina & Atlantic railroad into the charter of the Northwestern North Carolina Railroad, as required by its section 12, that every county near or through which the railroad may pass is authorized to subscribe for its stock to an amount authorized by a majority of the qualified voters of the county, and to issue bonds in payment, and to levy taxes to pay the principal and interest. The first question therefore now is, was the railroad which was constructed into Wilkes county by the Northwestern North Carolina Railroad Company a part of the railroad authorized to be built by its charter? If it was, then it would seem that the powers conferred by the charter operated to validate the action of Wilkes county, just as the same powers in the same charter were held by the supreme court of North Carolina in Belo v. Commissioners to have done in the case of Forsyth county. The convention ordinance authorizes counties to subscribe to the stock of the railroad company, and it provides that all counties subscribing shall do so in the manner and under the same rules, regulations, and restrictions set forth in the charter of 1852, c. 136. The only restriction in that charter which is drawn in question is the provision that the subscription shall be by counties near or through which the railroad may pass. The railroad in aid of which the bonds in suit were issued does pass through Wilkes county. It appears to us that it is the same railroad authorized by the convention ordinance. That ordinance authorizes a railroad running by way of Salem and Winston, in Forsyth county, to some point in the northwestern boundary line of the state, to be thereafter determined, and contemplated and provided for its being built by divisions, and enacted that the portion to Salem and Winston should constitute its first division. The piece of railroad for which the bonds in suit were issued does run from Salem and Winston in the general direction of the northwestern boundary line of the state, and, indeed, it seems evident that such a railroad to a point in the northwestern boundary line of the state must pass near or through Wilkes county. The act of Feb. 20, 1879, which is recited in the bonds as the authority for issuing them, definitely located this road running into Wilkes county. It does it by enacting that section 13 of the convention ordinance shall be amended by adding certain words which make it read, when so amended, as follows:

"Sec. 13. Be it further ordained that the company shall have power to construct branches of said road, one of which shall run from the towns of Winston and Salem by way of Mount Airy, in Surry county, to the line of the state of Virginia (amendment), "and one of which shall be constructed from the towns of Winston and Salem, up the Valley of the Yadkin by way of Jonesville and Wilkesboro, in the county of Wilkes, to Patterson's Factory, in the county of Caldwell, which branch shall be known as second division."

Section 2 of the act of February 20, 1879, provides for convict labor being furnished for the purpose of constructing this second division; and section 4 provides for bond subscriptions by any county in the state. This act was invalid so far as it attempted to give power to the counties to create a debt, because it was not passed as laws for that purpose are required by the constitution of North Carolina to be passed, but that invalidity does not affect the sections of the law which deal with other matters. Rodman v. Town of Washington, 122 N. C. 39, 42, 30 S. E. 118; Russell v. Ayer, 120 N. C. 180, 189, 27 S. E. 133, 37 L. R. A. 246; Gamble v. McCrady, 75 N. C. 509; Union Bank of Richmond v. Commissioners of Town of Oxford, 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487. So far as now appears, the amendment locating the road into Wilkes county was validly passed, and became a valid law of North Carolina. If section 13 had been originally enacted as it now reads as amended, it would seem clear that as when built this piece of road was declared to be the second division of said road, and as power was given to all counties "near or through which said railroad may pass" to subscribe for stock, that Wilkes county would be in the same category with Forsyth county, which is mentioned in the section locating the first division. Wilkes would be one of the counties through which the second division of the road was authorized to be constructed, just as Forsyth was a county into which the first division of the road was to be built. Has the supreme court of North Carolina ever interpreted this amendment and declared its meaning? We do not find that it has. In Commissioners v. Call, the majority opinion does not place the decision upon the contention that Wilkes county is not in the same category with Forsyth county, but upon a want of power affecting both alike, and upon the fact that an invalid enactment is recited on the face of the Wilkes county bonds as authority to issue them.

The original charter ordinance of 1868 having given authority to construct a railroad by way of Salem and Winston, in Forsyth county, to some point on the northwestern boundary line of the state, and to construct branches, and the legislature having afterwards validly enacted that one of these branches running towards the northwestern boundary line of the state, to be called the second division, should be constructed by way of Wilkes county, there would seem no sound reason for construing the legislation so as to deny to Wilkes county that power to issue bonds which the supreme court of North Carolina had in 1877 held that Forsyth county had.

It is urged in argument that the policy of North Carolina was declared by the constitution of 1868 to be hostile to permitting counties to bond themselves in order to subscribe to railroads which passed near or through them. We do not think this anywhere appears.

The constitution does not, as it might easily have done, if such had been the policy of its framers, declare that no county should have the power to create a debt for such a purpose; it merely provided that new laws for that purpose should be enacted with a special formality tending to insure their careful consideration by the legislature. The only inhibition which the constitution enacts against counties is by article 7, § 7, which is that no county shall loan its credit unless by a vote of the majority of the qualified voters, and the constitutional convention itself passed the charter of the Northwestern North Carolina Railroad with the power to the counties near or through which it should pass to issue bonds for subscription to its stock, and the constitution did not inhibit the execution of any powers previously given to counties to make subscriptions to railroad stock and issue bonds therefor. 180 U. S. 531, 21 Sup. Ct. 458, 45 L. Ed. 642. Nor does section 1996 of the Code of North Carolina, prescribing that counties shall have power to subscribe to aid in the completion of railroads in which their citizens may have an interest, nor the many enactments of the state legislature conferring upon counties the power to aid railroads, indicate such a policy, but, rather, a contrary one.

We think that Wilkes county when the bonds in suit were issued was in the same category with Forsyth county, and that the purchasers of the bonds had a right to rely and rest upon the decisions in the cases of Hill v. Commissioners (1870) 67 N. C. 367, and Belo v. Commissioners (1877) 76 N. C. 489, as to the power conferred by the ordinance of March 9, 1868, and that the different conclusion as to the power conferred by that ordinance arrived at and declared by a majority of the supreme court of North Carolina, long after the date of the issuing of the bonds in suit, cannot destroy the validity of the bonds in the hands of bona fide holders. Loeb v. Trustees, 179 U. S. 472, 492, 21 Sup. Ct. 174, 45 L. Ed. 280.

It is, of course, with great reluctance that we feel constrained to differ from the conclusion arrived at by the supreme court of North Carolina as announced in the majority opinion in Commissioners v. Call (1898), and it may be that the difference would not have arisen had the contentions in support of the validity of the bonds been as fully presented in that case in behalf of holders as deeply interested in them as they have since been in the supreme court of the United States and in this court in the litigation over their validity.

Having reached the conclusions herein expressed, it does not appear necessary to consider the effect of sections 1996–1999 of the Code of North Carolina giving power to counties to aid in the completion of railroads in which the citizens of the county have an interest.

The majority of the judges sitting in this appeal are of opinion that the decree of the circuit court should be affirmed.

BOYD, District Judge. In concurring with Judge MORRIS in his opinion in this case, I desire to say: This cause was argued upon the whole record, it being on appeal from a decree entered in the circuit court for the Western district of North Carolina at Greensboro, April

14, 1899, by Judge Purnell, designated to preside in that district by the circuit judge. The rights of the parties are to be determined upon the whole record, including the answers by the supreme court to the certified questions. The decision is reported in 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642. The answers to the questions certified are, in substance, as follows: (1) That the circuit court should have regarded the decisions set out in the questions as controlling upon the inquiry whether the legislative enactments of 1868, 1879, and 1881 were passed in such manner as to become, under the constitution, laws of the state. (2) That the rights of the parties in this case are determinable by the law of the state as it was declared by the state court to be at the time the bonds here involved were made in the name of the county and put upon the market. The questions certified by this court to the supreme court involved the validity of an issue of bonds in the sum of $100,000 by the county of Wilkes, in the state of North Carolina, in the year 1889, in payment of its subscription in this sum to the capital stock of the Northwestern North Carolina Railroad Company, a corporation constructing and owning a railroad running from Greensboro via Winston-Salem, in Forsyth county, to Wilkesboro, in Wilkes county. The power relied on by the complainants in the bill for the issue of the bonds was the ordinance of 1868, the charter of the company, and an act of assembly of the 11th of August, 1868, the sections 1996, 1997, etc., of the Code of North Carolina, an act of assembly of February 20, 1879, and an act of March 2, 1881, all referred to in paragraph 21 of the bill, page 7 of the record, etc. After the issue of these bonds, in due course of trade, there came into the hands of complainants 55 of the same, of the denomination of $1,000 each. The purchase of the same was for value, the highest market price, in good faith, and without notice, express or implied, that there was any suggestion of their being void, invalid, fraudulent, or otherwise than legal bonds in their issue and sale. It is alleged that the interest on these bonds was paid regularly for eight years by the county, and that such payment was enjoined by a judgment of the superior court of Wilkes county, affirmed by the supreme court, rendered in an action by the board of commissioners of the county against the treasurer, one Call, who, as such, held in his hands a fund for that purpose. It is alleged in the bill that this railroad runs over 20 miles in the county of Wilkes, and is the only railroad in that county. It is contended upon the part of the appellants that the decision of the supreme court of North Carolina in the action above set out should be followed by the circuit court. The supreme court, in answering the questions certified, disposed of that contention. Therefore I will not discuss it further than I have already in the Stanly Co. Case (No. 290, at this term) 113 Fed. 705. By reference to the decision of the supreme court, it is to be noted one thing decided was that the ordinance of 1868 was valid, and was in force after the constitution was adopted; and, further, that the supreme court of North Carolina had so held in the cases of Hill v. Commissioners, 67 N. C. 367 (June term, 1870), and in Belo v. Commissioners, 76 N. C. 489 (Aug. term, 1877). Further, it was held expressly that the Belo Case decided the ordinance of 1868, March 9th, conferred the power upon Forsyth county to make the subscription

made by the county, and that this was so independently of any other legislation. As to Wilkes county, the court states the question to be as follows: "Whether Wilkes county was so situated with reference to the contemplated road that it could be said to have had the same authority as was given to Forsyth county." Mr. Justice Harlan, delivering the opinion of the court, says: "Was Wilkes county in the same category as Forsyth county?" In short, if Wilkes county was in the same category with Forsyth county, then it stands decided by the supreme court of the United States that the ordinance of 1868 did give to Wilkes county the authority to issue the bonds in question, irrespective of the legislation of 1868, 1879, and 1881; so that the only question now is, whether Wilkes county was in the same category with Forsyth county. If so, the answer of the supreme court to the second question applies, which is that the rights of the parties in the Wilkes county case, this case, are determinable by the law of the state as it was decided by the state court to be at the time when the Wilkes county bonds were put upon the market. It results, therefore, that if Wilkes county was in the same category with Forsyth county the question is conclusively decided in favor of the validity of the bonds by the supreme court of the United States, without anything more, and the circuit court of appeals should affirm the judgment of the circuit court in this case. The supreme court of North Carolina, in Commissioners v. Call (1898) 123 N. C. 308, 317, 31 S. E. 481, 484, 44 L. R. A. 252, undertakes to distinguish the case of Belo v. Commissioners, 76 N. C. 489, as follows:

"We have not overlooked the fact that in Belo v. Commissioners, 76 N. C. 489, this court strongly intimates that section 12 of the charter did confer the authority given in section 33 of the act of 1852. [Section 2 of the ordinance of the constitutional convention gave the power, and section 12 prescribed the manner of its exercise], but it does so incidentally, and with little discussion, because it was not denied in the pleadings. This was not the determining point in the case, which turned chiefly upon the recitals in the bonds and the ratifying act of 1868. This is clearly shown in the opinion itself, which devotes four pages to the discussion of equitable estoppel arising on the recitals, and about half a page to the possible binding effect of the ordinance, winding up with the significant sentence on page 497, that 'as the case is presented to us, that question does not arise, and we do not decide it.' It evidently did not receive careful investigation, as it apparently did not arise in the pleadings. The court stated that the 'principle of equitable estoppel is a most important element in the transaction,' and that the recitals in the bonds (which were essentially different from those now before us) constituted an estoppel in pais upon the county of Forsyth."

There can be no estoppel by recitals in bonds in the absence of absolute legislative authority—power—to issue the same.

The whole discussion of the supreme court of North Carolina in Belo v. Commissioners, which, as stated by the court in the case of Commissioners v. Call, occupied four pages, proceeded upon the only possible ground,—that there was legislative authority in the ordinance of 1868, but that perhaps that authority had not been strictly followed. The question which the court on page 497 says "does not arise" is this question, stated in the very words of the opinion of the court, in Belo v. Commissioners, to wit:

"When the subscription was voted there is authority and reason for asserting that the justices could have been compelled, by process of law, to make the subscription, unless in defense they could have shown that the election was not fairly conducted, but was influenced by the fraud of the railroad company. People v. Board of Sup'rs of City and County of San Francisco, 27 Cal. 655. As the case is presented to us, that question does not arise and we do not decide it."

On the question of whether there was power to issue the bonds, the court said distinctly:

"The county was clothed with the power to issue them, and it is admitted that a majority vote sanctioned the subscription of stock and the issue of the bonds."

Again, the court said:

"It has been one purpose of this opinion to show that the bonds were valid in the hands of bona fide holders without the aid of this healing act;" that is, the act of August 11, 1868, the only other authority being the said ordinance.

The case of Belo v. Commissioners was decided in 1877, many years before the issue of these bonds, and, as before said, is the great leading case upon this subject in North Carolina. This decision, and the impression it made upon the supreme court of the United States, as shown by the importance attached to it by Justice Harlan, has left but little for this court to decide. As said by Bynum, J., the author of the Belo decision—opinion—there was but one purpose he had in mind: To show the ordinance of the convention of 1868, the original charter of the company, gave the power to Forsyth county to issue the bonds, and was not, and did not become, ineffective upon the ratification of the constitution. No recital in any bond ever did confer power to issue it. There must, in every case, first, be shown a power to issue, after which the recitals may be relied on by an innocent purchaser as assurance of the proper exercise of the power, and of the performance of the conditions precedent to the issue by the corporate authorities, putting the bonds upon the market. This rule—this principle—is axiomatic, universal, and has no exception.

Judge MORRIS has shown clearly that Wilkes county was in the same category with Forsyth county,—the only question left open by the supreme court of the United States. The importance, however, of the interests involved demands that I should add something to what he has said upon this question. In the case of Union Bank of Richmond v. Commissioners of Town of Oxford, 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487, the act is expressly held valid as a charter, and for all purposes except as a taxing act. For that purpose it was void, because not passed as required by the constitution. Section 1 of the act of 1879, directing that the road should run "up the valley of the Yadkin, by way of Jonesville and Wilkesboro, in the county of Wilkes," etc., is valid, and an amendment to the charter, the ordinance of 1868. This puts Wilkes county in the same category as Forsyth county, in the sense suggested by Justice Harlan. The route of the road was determined by the legislature, and by the company also. Justice Harlan was not advertent

to the fact that the act of 1879 was only adjudged void as a tax-ing act by the court, not for all purposes, but for this purpose only. In the case of Union Bank of Richmond v. Commissioners of Town of Oxford, 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487, the act is expressly declared valid as a railroad charter, because the certifica-tion cannot be impeached by the journals, but void as a taxing act, because, for that purpose, under the constitution, it can be impeached by the same journals. It is well settled in all courts that an act may be unconstitutional in part and constitutional in other respects. So section 1 of the act of 1879 is valid, because passed in all respects and certified as required by the constitution. See act of 1879, and especially section 5, etc., where, upon its face, it is shown to have been read three times and ratified. The case of Union Bank of Richmond v. Commissioners of Town of Oxford, 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487, is decisive of this, being directly in point, and, indeed, is the case out of which all this litigation has sprung. And, further, if the route was not a proper one, it was acquiesced in by the county when the company could have been forced, by man-damus, to have selected the proper one; or it could have been en-joined anyhow from constructing the road on the route determined upon if not the proper one. Rodman v. Town of Washington, 122 N. C. 39, 42, 30 S. E. 118; Russell v. Ayer, 120 N. C. 180, 189, 27 S. E. 133, 37 L. R. A. 246; Gamble v. McCrady, 75 N. C. 509,—all cited by Judge MORRIS. So it appears the route was determined by the legislature, by the company, and, at last, acquiesced in by the county. I say by the company, because this legislation,—that is to say, the ordinance,—conferred the power upon the county of Forsyth and a privilege upon the company. Wilkes county is in the same category with Forsyth, so far as these powers are con-cerned, and it was one of the privileges of the company conferred also to determine the route of the road. These powers are not only conferred upon the counties, but are privileges of the company, the Northwestern North Carolina Railroad Corporation. It follows, therefore, that Wilkes county was in "the same category" with For-syth county.

The route of the road was determined by both the legislature and the corporation. This was one of the privileges conferred upon the company. And, besides, as before said, it is not for the county of Wilkes, which participated in the determination of the route, to be heard to say, in a suit by an innocent bondholder, years after it was determined, there was no power to do it. In the case of the Scot-land Co. v. Thomas, 94 U. S., on page 689, 24 L. Ed. 219, Justice Bradley says:

"The specific question in the present case, therefore, is whether the au-thority given the counties and towns, in 1847, to subscribe to the capital stock of the Alexandria and Bloomfield Railroad Company has become ex-tinguished by the subsequent consolidation of that company with other com-panies."

Justice Bradley says, also, on page 688, 94 U. S., 24 L. Ed. 219, after quoting the words of the constitution of Missouri similar to the words of the North Carolina constitution of 1868, that:

"This prohibition, it will be observed, is against the legislature's authorizing municipal subscriptions or aid to private corporations. It does not purport to take away any authority already granted."

On page 693, 94 U. S., 24 L. Ed. 221, Justice Bradley goes on to say:

"But the case has other aspects which it is necessary to take into consideration. * * * The project of the railroad promised a great public improvement, conducive to the interests of Alexandria and the counties through which it would pass. The power was sought at the hands of the legislature, and was given."

It was relied on by those who subscribed their private funds to the enterprise. Speaking of this power, he says:

"Why it should not still attach to this portion of the road as one of the rights and privileges belonging to it, into whose hands soever it comes, by consolidation or otherwise, it is difficult to see. * * * Subscription to the stock was not only a power of the county, but a privilege of the company."

I have not discussed the sections of the Code in this connection, because I do not consider it necessary, having already done so in the Stanly Case (at this term), before referred to. The supreme court, in answer to the certified questions, has narrowed the issues between the parties to a small compass in this case. It is clear that the two counties, Forsyth and Wilkes, were in the same category, as I say, in the sense expressed by Justice Harlan. Having determined that, our duty seems to me plain. The decree entered upon the circuit should, in my opinion, be affirmed.

GOFF, Circuit Judge. I dissent from the opinion of the court, as well as from the judgment entered in this case.